**PUBLISHED**

Present:    Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux,
                Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White
Argued at Richmond, Virginia


JORDAN DARRELL MORRIS

                                                                        OPINION BY
v.        Record No. 1194-21-2                         JUDGE LISA M. LORISH
                                                                        MAY 9, 2023

COMMONWEALTH OF VIRGINIA


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Randall G. Johnson, Jr., Judge

H. Pratt Cook, III (Law Office of H. Pratt Cook, III, on briefs), for
appellant.

Stephen J. Sovinsky, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Virginia's overdose reporting statute, Code § 18.2-251.03, shields from arrest or

prosecution individuals who, in good faith, seek or obtain emergency medical assistance because

they are experiencing a drug overdose.  The trial court found Morris did not qualify for immunity

under the statute.  A panel of this Court reversed, dividing on how to interpret and apply the

definition of "overdose" set out in Code § 18.2-251.03(A), as well as the requirement that an

individual be "experiencing an overdose."  After rehearing en banc, we affirm the trial court for a

different reason—Morris failed to meet the independent requirement in Code

§ 18.2-251.03(B)(2) that he "remain[] at the scene of the overdose or at any alternative location

to which he . . . has been transported until a law-enforcement officer responds to the report of an

overdose."

BACKGROUND

After law enforcement first encountered Jordan Darrell Morris outside the Short Pump emergency room, Morris was charged with possession of a Schedule I or II controlled substance (in violation of Code § 18.2-250) and driving under the influence of drugs, first offense (in violation of Code § 18.2-266).

The Commonwealth gave notice of its intent to use at trial a lab analysis showing that Morris's blood tested positive for cocaine and that cocaine residue was found on a smoking device in the car he was driving. Morris moved to suppress the drug evidence and to dismiss the drug-possession charge under the immunity provision of Code § 18.2-251.03. Morris argued that he "was actively seeking medical care for himself when the Henrico police developed the evidence against him." The motion explained:

> Morris was trying to seek medical attention at Short Pump Emergency Room when he stopped the vehicle in the middle of the roadway adjacent to the emergency hospital. Henrico police officers Cirillo and Steelman observed that Morris was under the influence of drugs, and Morris told them he had recently smoked crack cocaine. Morris told the officers he was contemplating suicide because of drugs and made suicidal statements at the hospital.

The Commonwealth's written opposition asserted that Morris "had produced no evidence or testimony from any medical personnel present that evening, nor any other evidence, that he was experiencing an overdose."

At a hearing on Morris's suppression motion and motion to dismiss, both sides "agreed to proffer the facts." Paraphrasing the police report, Morris's counsel represented that Henrico police officers observed a white Ford Edge trying to turn onto the road next to the Short Pump emergency room. The vehicle nearly struck a curb in the turn lane and then stopped in the middle of the road, blocking through-traffic. The officers approached the vehicle, driven by

- 2 -

Morris, and asked him to park the car. Morris said that "he was there to get help," telling the officers that he had smoked crack cocaine. The officers thought he appeared to be under the influence of drugs and escorted Morris into the emergency room.

As medical personnel drew a blood sample, Morris "made suicidal statements." In response to law enforcement questioning, Morris said that he worked at Food Lion; he was high while at work and asked to sit in his boss's car to call his mother; he had called his mother "because he was thinking about committing suicide"; and he had driven away from the Food Lion and had driven around awhile before heading to the Short Pump emergency room. When asked whether his mother had told him to "go to the ER," Morris said he "chose to do so himself" because "he was thinking about suicide." When an officer asked why he was considering suicide, Morris responded, "drugs." Morris said that he used heroin, fentanyl, and cocaine, that he had smoked crack cocaine in his boss's car, and that he "came to the ER to get help for the suicidal thoughts and his drug problem." Morris alerted the officers to a crack pipe in the vehicle, which they found tucked in the crevice of the passenger seat. The Commonwealth agreed to "the Defense version" of the facts.

The Commonwealth argued that Morris was required to present expert testimony that he was in fact experiencing an overdose and that it was not enough to simply take his word for it. Morris's counsel argued that the immunity statute applied because the lab tests showed cocaine in Morris's blood, Morris drove himself to the emergency room seeking treatment, and he said three times that he was suicidal because of his drug use.

Ruling from the bench, the trial court denied Morris's motions to suppress the drug evidence and to dismiss the drug possession charge. The court saw "no evidence that [Morris] was experiencing a life-threatening condition." It was "not going so far as to say" that a medical professional had to be called as a witness to prove an overdose—circumstantial evidence could

- 3 -

suffice.  But the court found the proffer insufficient: "[J]ust because" the drugs "affected his behavior [did] not mean we're in a life-threatening situation."  The court also observed that there must be "some showing" that Morris's expression of wanting to kill himself "was caused by the ingestion of cocaine and this overdose situation."

Morris subsequently pleaded no contest to the charges against him, reserving his right to appeal the immunity ruling on the drug-possession charge.  The trial court accepted the pleas, finding Morris guilty on both charges.

ANALYSIS

The proper interpretation of Code § 18.2-251.03 is a question of law that we review de novo.  *Broadous v. Commonwealth*, 67 Va. App. 265, 268 (2017).

Virginia's overdose reporting statute was first enacted in 2015, 2015 Va. Acts chs. 418, 436 (codified at Code § 18.2-251.03), and has been amended three times since then, each time expanding its protections.  In its current form, the statute provides full immunity from "arrest or prosecution" for qualifying individuals (prior versions had characterized the immunity as an "affirmative defense").  And it now covers not only someone who helps another experiencing an overdose, but also the person who "is experiencing an overdose"—assuming other criteria in the statute are met.  Before these expansions, we observed that the "clear purpose" of the law was to "encourage . . . prompt emergency medical treatment [for] those who have suffered an overdose as a result of ingesting a controlled substance."  *Broadous*, 67 Va. App. at 271.  The recent amendments reinforce this goal.

We briefly review the structure of the statute before applying it to the facts proffered below.  The statute opens by defining "overdose" as "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such

- 4 -

substances." Code § 18.2-251.03(A). Then, the statute sets out four requirements before an individual is shielded from "arrest or prosecution" for specified controlled substance offenses:

> 1. Such individual (i) in good faith, seeks or obtains emergency medical attention (a) for himself, if he is experiencing an overdose, or (b) for another individual, if such other individual is experiencing an overdose; (ii) is experiencing an overdose and another individual, in good faith, seeks or obtains emergency medical attention for such individual, by contemporaneously reporting such overdose to [specified emergency responders]; or (iii) in good faith, renders emergency care or assistance, including [specified means];
>
> 2. Such individual remains at the scene of the overdose or at any alternative location to which he or the person requiring emergency medical attention has been transported until a law-enforcement officer responds to the report of an overdose. If no law-enforcement officer is present at the scene of the overdose or at the alternative location, then such individual shall cooperate with law enforcement as otherwise set forth herein;
>
> 3. Such individual identifies himself to the law-enforcement officer who responds to the report of the overdose; and
>
> 4. The evidence for the prosecution of an offense enumerated in this subsection was obtained as a result of the individual seeking or obtaining emergency medical attention or rendering emergency care or assistance.

Code § 18.2-251.03(B). Next, the statute includes a carve-out from immunity:

> The provisions of this section shall not apply to any person who seeks or obtains emergency medical attention for himself or another individual, to a person experiencing an overdose when another individual seeks or obtains emergency medical attention for him, or to a person who renders emergency care or assistance to an individual experiencing an overdose while another person seeks or obtains emergency medical attention during the execution of a search warrant or during the conduct of a lawful search or a lawful arrest

Code § 18.2-251.03(C). The remaining parts of the statute are not relevant here.

The trial court found Morris had not shown that he was experiencing a life-threatening condition caused by controlled substances. We conclude instead that the "the best and narrowest

- 5 -

ground for decision is the determination that the trial court reached the right result for a reason different than the one upon which it appears ultimately to have relied." *Vandyke v. Commonwealth*, 71 Va. App. 723, 731 (2020); *see Commonwealth v. White*, 293 Va. 411, 419 (2017) (recognizing the doctrine of judicial restraint requires appellate courts to decide cases on the best and narrowest grounds). As this case proceeded by agreed proffer,[1] all of the "evidence necessary to that alternate ground was before the trial court," and that evidence was "undisputed." *Vandyke*, 71 Va. App. at 732.

Where, as here, the individual (allegedly) experiencing the overdose is the one seeking immunity, the statute does not apply unless the individual "remains at the scene of the overdose or at any alternative location to which he . . . has been transported until a law-enforcement officer responds to the report of an overdose." Code § 18.2-251.03(B)(2).[2] The subsection continues: "If no law-enforcement officer is present at the scene of the overdose or at the alternative location, then such individual shall cooperate with law enforcement as otherwise set forth herein." *Id.* The Commonwealth argued on brief that Morris cannot meet this requirement because he "borrowed a car and drove to the emergency room—failing to stay at the scene of the alleged overdose" and he also had not "been transported" to the hospital. At oral argument,

---

[1] The fact that Morris proceeded by limited proffer below is one of the reasons that it would be unwieldy to resolve whether Morris met the definition of "overdose," or whether the evidence was sufficient to show he was "experiencing" an overdose. Layered on this slim factual showing, Morris's counsel incorrectly argued below that the statute set out an "affirmative defense" (relying on the prior version of the law), and the trial court appears to have relied on that representation, which further obscures our ability to review these questions.

[2] For purposes of this analysis, we assume, without deciding, that suicidal ideation meets the definition of overdose in Code § 18.2-251.03(A). *See McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) (recognizing that "where the ability of the Court to review an issue on appeal is in doubt . . . 'assum[ing] without deciding' that the issue can be reviewed" may allow the Court "to resolve the appeal on the best and narrowest grounds").

Morris contended that the "scene of the overdose" was fluid and continuous, following him everywhere that he went while experiencing suicidal thoughts.

While the "remains at the scene" requirement has been a part of every version of Virginia's overdose reporting statute, we have never analyzed it until now. As always, when interpreting a statute, "our primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012) (quoting *Commonwealth v. Amerson*, 281 Va. 414, 418 (2011)). "[W]e examine a statute in its entirety, rather than by isolating particular words or phrases." *Cummings v. Fulghum*, 261 Va. 73, 77 (2001). And the "plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, or strained construction." *Brown v. Commonwealth*, 75 Va. App. 388, 405 (2022) (quoting *Turner v. Commonwealth*, 226 Va. 456, 459 (1983)).

Morris urges us to strip the words "scene" and "overdose" from all surrounding context. As his argument goes, anywhere a person is experiencing "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances" is the "scene" of the overdose. By merely existing in a state of overdose at any location, a person has then, necessarily, remained at the scene. And as long as they eventually cooperate with law enforcement, they would meet the statutory criteria.

The problem with Morris's interpretation is that it renders superfluous most of Code § 18.2-251.03(B)(2). The only rational reading of the legislature's choice of the word "remain" is that the individual stay in place—either at the "scene" where the overdose occurred, or the

"alternative location" to which the person has been transported.[3]  "Remain" would be superfluous if the individual need not in fact "remain" anywhere.  The problem extends to the second half of the sentence about "any alternative location to which he . . . has been transported."  Any such "alternative location" would already be covered by Morris's expansive proposed reading of "scene."  Indeed, if the legislature had intended this outcome, the statute as applied to the individual experiencing the overdose could just say:

> Such individual ~~remains at the scene of the overdose or at any alternative location to which he or the person requiring emergency medical attention has been transported until a law-enforcement officer responds to the report of an overdose.  If no law-enforcement officer is present at the scene of the overdose or at the alternative location, then such individual~~ shall cooperate with law enforcement as otherwise set forth herein.

We reject this reading, which would cause us to run aground of a fundamental principle of statutory interpretation: we must presume that every part of a statute has "some effect and no part will be considered meaningless unless absolutely necessary."  *City of Richmond v. Va. Elec. & Power Co.*, 292 Va. 70, 75 (2016) (quoting *Lynchburg Div. of Soc. Servs. v. Cook*, 276 Va. 465, 483 (2008)).[4]

---

[3] As for this latter option, we assume that when the legislature used the phrase "to which he *has been transported*" (emphasis added), the "legislature understood the basic rules of grammar." *Petit Frere v. Commonwealth*, 19 Va. App. 460, 464 (1995).  "Voice shows whether the subject acts (active voice) or is acted on (passive voice)—that is, whether the subject performs or receives the action of the verb."  The Chicago Manual of Style § 5.115 (16th ed. 2010).  Thus, absent context suggesting the legislature intended a different result, "any alternative location to which he or the person requiring emergency medical attention *has been transported*" excludes a location to which the person experiencing an overdose has transported himself.  (Emphasis added).

[4] Because the conditions set forth in Code § 18.2-251.03(B)(1)-(4) are conjunctive, we respectfully disagree with our concurring colleague that it is inharmonious to read (B)(1) as establishing the three categories of individuals who may qualify for immunity and (B)(2) as adding additional necessary criteria.

Instead, we conclude the statute requires an individual experiencing an overdose to remain at the location where the "life-threatening condition" began, or at the location to which he has been transported by another. The overdose reporting statute is designed to *save* lives and to encourage individuals experiencing an overdose, and those around them, to seek medical attention without fear. An interpretation that would permit individuals actively under the influence of controlled substances or alcohol to operate a motor vehicle could *endanger* lives.

Turning to the proffered facts here, Morris was "high" at work when he asked to borrow his boss's car. He smoked crack cocaine in that car. He also called his mother from the car "because he was thinking about committing suicide." At some point, Morris drove himself away from the Food Lion and drove around for a "little bit" before heading to the Short Pump emergency room. Police officers observed the car trying to turn onto the road next to the Short Pump emergency room, but then the vehicle nearly struck a curb in the turn lane and stopped in the middle of the road, blocking through-traffic. Officers then approached the vehicle. Morris said that "he was there to get help," and the officers then escorted Morris into the emergency room.

Based on these facts, we cannot pinpoint the exact location where the event giving rise to the need for emergency care occurred. But we need not determine the exact location to know that the scene of the purported overdose was necessarily a location where Morris was *before* he decided to seek medical care, and thus somewhere *other* than where he stopped the car in the middle of the road next to the emergency room.[5] To receive immunity from prosecution, the

_____

[5] Any suggestion that Morris first expressed a need for medical care only *after* law enforcement approached his vehicle stopped in the middle of the road runs aground on Code § 18.2-251.03(C). This subsection complements the statute's earlier good faith requirement by excluding from immunity anyone who first seeks medical care only *after* law enforcement has begun "execut[ing] . . . a search warrant" or "conduct[ing] . . . a lawful search or a lawful arrest." *Id.*

statute required Morris to remain wherever he began experiencing the drug-induced life-threatening condition. He did not do so. Thus, the trial court did not err in refusing to dismiss the drug possession charge.

## CONCLUSION

For these reasons, we affirm the ruling of the trial court below.

*Affirmed.*

Raphael, J., with whom Ortiz, J., joins, concurring.

I agree with the majority that this appeal can be decided on narrower grounds that do not resolve the main issues briefed during our rehearing en banc. I also agree that Morris was not entitled to immunity from prosecution because he did not "remain[] at the scene of the overdose" and was not transported by someone else to an "alternative location," as contemplated by subsection (B)(2) of Code § 18.2-251.03. The earlier panel decision focused, instead, on whether subsection (B)(1) called for a subjective or objective standard in determining that Morris was "experiencing an overdose." *Morris v. Commonwealth*, 75 Va. App. 257, 268-77 (2022). Writing for the panel majority, I concluded that the statute applied a subjective standard. *Id.* The dissent thought that an objective standard applied. *Id.* at 287-96 (Russell, J., dissenting). During en-banc review, the Commonwealth argued for the first time that Morris was not immune from prosecution because he did not remain at the scene of the overdose, as required by subsection (B)(2). In reversing the panel and affirming the trial court, the Court here properly relies on that argument under the right-for-a-different-reason doctrine, consistent with our obligation to "look for the best and *fewest* grounds on which to resolve this appeal." *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023).

I do agree with Judge Callins that the majority's plain-language reading of subsection (B)(2) will lead to odd results when, for example, a person suffering an overdose within walking distance of an emergency room is denied immunity if he walks there himself, rather than calling the police or waiting for medical transport. Still, the majority has the better reading of the statutory text that drives that conclusion, and I therefore concur in the majority's opinion.

I write separately to address the issues that go unresolved here, which may arise in future litigation and which the General Assembly may wish to clarify.

- 11 -

I.

Since New Mexico enacted the first medical-amnesty law in 2007, *see* 2007 N.M. Laws 260, every State in the country has followed suit except Kansas and Wyoming.[6] States have taken different approaches to incentivize seeking medical help for persons overdosing on drugs or alcohol. Some permit defendants to use the summoning of medical help in response to an overdose event as a mitigating circumstance at sentencing; some permit the defendant to raise the summoning of assistance as an affirmative defense to criminal liability; and some provide immunity from arrest and prosecution.[7]

One 2020 survey noted that such statutes are "[o]ften called 'medical amnesty laws' (MALs), 'medical immunity laws,' or 'Good Samaritan laws.'"[8] Some States have called them "Good Samaritan Overdose Laws" or "911 Immunity Laws," *Morris*, 75 Va. App. at 266 (quoting Nicole Schill, *The Fatal Shortcomings of Our Good Samaritan Overdose Statutes and Proposed Model Statute*, 25 Cardozo J. Equal Rts. & Soc. Just. 123, 126 (2018)), even though these statutes typically protect the victim as well as the good Samaritan, and even if help arrives without calling 911. Until the General Assembly tells us what to call Code § 18.2-251.03, I find that "medical amnesty" best captures the essence of the statute in the fewest words. As this Court explained six years ago, "[t]he clear purpose of the statute is to provide what amounts to a

---

[6] For helpful jurisdictional surveys, see Legislative Analysis & Public Policy Association, *Good Samaritan Fatal Overdose Prevention and Drug-Induced Homicide: State Laws* (Dec. 2021), http://legislativeanalysis.org/wp-content/uploads/2021/12/GOODSA1.pdf; Government Accounting Office, *Most States Have Good Samaritan Laws and Research Indicates They May Have Positive Effects* (Mar. 2021), https://www.gao.gov/assets/gao-21-248.pdf.

[7] *See* GAO Report, *supra* note 6, at 12-13; *see also* Nicole Schill, *The Fatal Shortcomings of Our Good Samaritan Overdose Statutes and Proposed Model Statute*, 25 Cardozo J. Equal Rts. & Soc. Just. 123, 138-42 (2018).

[8] *See* Thomas M. Griner, et al., *State-by-State Examination of Overdose Medical Amnesty Laws*, 40 J. Legal Med. 171, 174 (2020).

'safe harbor' from prosecution to encourage the provision of prompt emergency medical treatment to those who have suffered an overdose as a result of ingesting a controlled substance." *Broadous v. Commonwealth*, 67 Va. App. 265, 271 (2017).

As enacted in 2015, Virginia's statute first followed the "affirmative defense" approach. 2015 Va. Acts chs. 418, 436 (codified at Code § 18.2-251.03). As *Broadous* recognized, the General Assembly "obviously made a policy determination that encouraging others, who may themselves be guilty of violating the laws involving controlled substances, to call 911 in an effort to save a life is more important than their prosecution." 67 Va. App. at 271. Still, we concluded that the statute's plain language did "not extend the affirmative defense protection to another individual who merely receives emergency medical attention because someone else reported the overdose." *Id.* at 272.

The General Assembly has revisited the statute three times since then, each time expanding its protections. The 2019 amendment eliminated a requirement that the defendant must have cooperated in any criminal investigation relating to the substance that caused the overdose. 2019 Va. Acts ch. 626 (deleting Code § 18.2-251.03(B)(4)).

The 2020 amendment made two more changes. 2020 Va. Acts ch. 1016. It upgraded the nature of the amnesty from an "affirmative defense" to an immunity from "arrest or prosecution." Code § 18.2-251.03(B) (Supp. 2020). The amendment also superseded the ruling in *Broadous*, extending immunity to a person who "is experiencing an overdose" when "another individual, in good faith, seeks or obtains emergency medical attention for such individual." *See* Code § 18.2-251.03(B)(1)(ii); *McCarthy v. Commonwealth*, 73 Va. App. 630, 646 (2021) (describing the 2020 amendments).

The 2021 amendment further expanded the amnesty provided to good Samaritans. The amendment immunizes a person who, "in good faith, renders emergency care or assistance,

including cardiopulmonary resuscitation (CPR) or the administration of naloxone or other opioid antagonist for overdose reversal, to an individual experiencing an overdose while another individual seeks or obtains emergency medical attention in accordance with this subdivision." 2021 Va. Acts Sp. Sess. I ch. 29 (codified at Code § 18.2-251.03(B)(1)(iii)).

Because State medical-amnesty laws like ours are relatively new, numerous questions about their scope and interpretation need to be resolved to clarify how these laws should operate in practice. This case has revealed a number of those legal wrinkles.

II.

The Court's resolution of this appeal on a single narrow ground leaves unanswered the main question briefed by the parties during en-banc review: does an objective or subjective standard govern whether a person is "experiencing an overdose" within the meaning of Code § 18.2-251.03(B)(1)? Three possible standards could apply: two of them are objective; one is subjective.

The first possibility would be a "scientifically objective standard": the trier of fact must be persuaded that the person experiencing an overdose was, in fact, overdosing. To date, no State appears to have adopted that standard, although one dissenting judge recently argued for it. *See State v. Rowe*, 354 So. 3d 1187, 1196 (La. 2022) (Crain, J., dissenting). As Justice Crain explained, "'Overdose' is a medical term requiring medical evidence to prove." *Id.* He would have held that Louisiana's statute provided immunity only when the defendant or the person he was trying to save was suffering "an actual 'overdose,'" not when the victim "only *appears* to have overdosed." *Id.* at 1197. But the majority of the Louisiana Supreme Court rejected that standard, noting that such a "narrow and highly-technical reading subverts the purpose of the law, which is to remove the fear of prosecution and to encourage bystanders to seek help." *Id.* at 1194.

- 14 -

> If a third party fears that an apparent overdose may not be severe enough to later receive confirmation by a medical expert, the witness might equivocate about calling 911. The chilling effect of the application of the law endorsed by the [court of appeals] majority in this case could counteract the very problem sought to be addressed by the provision.

*Id.*

The earlier panel opinion here noted the same problem. *See Morris*, 75 Va. App. at 274-75. As I wrote for the majority, a scientifically objective standard would frustrate our statute's "'clear purpose . . . to encourage . . . prompt emergency medical treatment' for overdose victims." *Id.* at 274 (alterations in original) (quoting *Broadous*, 67 Va. App. at 271). To have immunity, the defendant would have to prove—likely through medical evidence and expert testimony—that he was in fact overdosing, or that the victim for whom he called for emergency medical assistance was overdosing. That high bar would discourage reporting; it would chill overdose victims from seeking help and deter good Samaritans from calling for help for fear of their own liability for drug possession. *Id.* at 274-75.

The second possible standard would be a reasonable-person standard: would a reasonable person in the defendant's position have believed that he was experiencing an overdose, or that the victim for whom he called for assistance was experiencing an overdose? Thirty-five States have codified a reasonable-person standard in their medical-amnesty laws.[9] The reasonable-

---

[9] *See* Ark. Code Ann. § 20-13-1703 ("that a *reasonable person* would believe to be resulting from, the consumption or use" of alcohol or drugs (emphasis added)); Cal. Health & Safety Code § 11376.5(e) ("a *reasonable person* of ordinary knowledge would believe the condition to be a drug-related overdose that may result in death, disability, or serious injury" (emphasis added)); Conn. Gen. Stat. § 21a-279(d) (exempting "any person (1) who in good faith, seeks medical assistance for another person who such person *reasonably believes* is experiencing an overdose . . . , (2) for whom another person, in good faith, seeks medical assistance, *reasonably believing* such person is experiencing an overdose . . . , or (3) who *reasonably believes* he or she is experiencing an overdose" (emphases added)); Del. Code Ann. tit. 16, § 4769(a)(2) ("if a layperson could *reasonably believe* that the condition is in fact an overdose and requires medical assistance" (emphasis added)); D.C. Code § 7-403(a)(1)(A)-(C) (protecting

- 15 -

"a person who: (A) *Reasonably believes* that he or she is experiencing a drug or alcohol-related overdose . . . .; (B) *Reasonably believes* that another person is experiencing a drug or alcohol-related overdose . . . .; (C) Is *reasonably believed* to be experiencing a drug or alcohol-related overdose . . .; or (D) Is a bystander to a situation described in subparagraph (A), (B), or (C)" (emphases added)); Ga. Code Ann. § 16-13-5(a)(1) ("that a *reasonable person* would believe to be resulting from the consumption or use of a controlled substance or dangerous drug by the distressed individual" (emphasis added)); Haw. Rev. Stat. § 329-43.6(a)(2) ("that a layperson would *reasonably believe* to be a drug or alcohol overdose that requires medical assistance" (emphasis added)); Ind. Code Ann. § 35-38-1-7.1(b)(12) ("an individual who *reasonably appeared* to be in need of medical assistance due to the use of alcohol or a controlled substance" (emphasis added)); Iowa Code § 124.418(1)(a)(3) ("The person's condition is the result of, or a prudent layperson would *reasonably believe* such condition to be the result of, the consumption or use of a controlled substance." (emphasis added)); Ky. Rev. Stat. Ann. § 218A.133(1)(a) ("that a layperson would *reasonably believe* requires medical assistance" (emphasis added)); Md. Code Ann., Crim. Proc. § 1-210(c) ("*reasonably believes* that the person is experiencing a medical emergency after ingesting or using alcohol or drugs" (emphasis added)); Mich. Comp. Laws § 333.7403(7)(a) ("that a layperson would *reasonably believe* to be a drug overdose that requires medical assistance" (emphasis added)); Minn. Stat. Ann. § 604A.05, Subd. 5 ("that a layperson would *reasonably believe* to be a drug overdose that requires immediate medical assistance" (emphasis added)); Miss. Code Ann. § 41-29-149.1(2)(a) ("that a layperson would *reasonably believe* to be resulting from the consumption or use of a controlled substance or dangerous drug for which medical assistance is required" (emphasis added)); Mo. Rev. Stat. § 195.205(1) ("that a person would *reasonably believe* to be a drug or alcohol overdose that requires medical assistance" (emphasis added)); Neb. Rev. Stat. § 28-472(6) ("which condition a layperson would *reasonably believe* requires emergency medical assistance" (emphasis added)); Nev. Rev. Stat. § 453C.150(5) ("that an ordinary layperson would *reasonably believe* to be a drug or alcohol overdose that requires medical assistance" (emphasis added)); N.H. Rev. Stat. Ann. § 318-B:28-b(I)(a) ("an acute condition resulting from or believed to be resulting from the use of a controlled drug which a layperson would *reasonably believe* requires medical assistance" (emphasis added)); N.Y. Penal Law § 220.78(3)(a) ("if a prudent layperson, possessing an average knowledge of medicine and health, could *reasonably believe* that the condition is in fact a drug or alcohol overdose and (except as to death) requires health care" (emphasis added)); N.C. Gen. Stat. Ann. § 90-96.2(a) ("that a layperson would *reasonably believe* to be a drug overdose that requires medical assistance" (emphasis added)); N.D. Cent. Code § 19-03.1-23.4 ("the overdosed individual must have been in a condition a layperson would *reasonably believe* to be a drug overdose requiring immediate medical assistance" (emphasis added); Okla. Stat. tit. 63, § 2-413.1(A)(1) (directing peace officer not to take person into custody for "offense involving a controlled dangerous substance . . . if the peace officer . . . *reasonably believes* that . . . the person requested emergency medical assistance for an individual who *reasonably appeared* to be in need of medical assistance due to the use of a controlled dangerous substance" (emphases added)); Or. Rev. Stat. Ann. § 475.898(7)(b) ("that a person would *reasonably believe* to be a condition that requires medical attention" (emphasis added)); 35 Pa. Cons. Stat. § 780-113.7(f) ("a prudent layperson, possessing an average knowledge of medicine and health, would *reasonably believe* that the condition is in fact a drug overdose and requires immediate medical attention" (emphasis added)); S.C. Code Ann. § 44-53-1910(2)

- 16 -

person standard is objective because it does not turn on whether the defendant subjectively

believed that he was overdosing or that the person for whom he called for help was overdosing.[10]

("that a layperson would *reasonably believe* to be a drug or alcohol overdose that requires medical assistance" (emphasis added)); S.D. Codified Laws § 34-20A-109(1) ("that a person would *reasonably believe* to be a drug overdose that requires medical assistance" (emphasis added)); Tenn. Code Ann. § 63-1-156(a)(2) ("that a *reasonable person* would believe to be resulting from the consumption or use of a controlled substance or other substance by the distressed individual" (emphasis added)); Utah Code Ann. § 58-37-8(16)(a)(i) ("*reasonably believes* that the person or another person is experiencing an overdose event due to . . . a controlled substance or other substance" (emphasis added)); Vt. Stat. Ann. tit. 18, § 4254(a)(1) ("that a layperson would *reasonably believe* requires medical assistance" (emphasis added)); W. Va. Code § 16-47-4(a) ("a person who *reasonably appears* to be experiencing an overdose (emphasis added)); Wis. Stat. § 961.443(1)(a) ("if a *reasonable person* would believe him or her to be, suffering from an overdose of, or other adverse reaction to, any controlled substance" (emphasis added)).

Some States that use a reasonable-person standard have other provisions suggesting a hybrid approach. *Compare* Mont. Code Ann. § 50-32-609(1)(a) (protecting good Samaritan who "seeks medical assistance for another person who is experiencing an actual or *reasonably perceived* drug-related overdose" (emphasis added)), *with id.* § 50-32-609(1)(b) (protecting defendant "who experiences a drug-related overdose and is in need of medical assistance"). *See also* Colo. Rev. Stat. § 18-1-711(5) ("that a layperson would *reasonably believe* to be a drug or alcohol overdose that requires medical assistance" (emphasis added)). *But see People v. Harrison*, 465 P.3d 16, 23 (Colo. 2020) (holding that Colorado's statute requires "requires both that a person report in good faith what she subjectively perceives is an acute condition caused by the consumption or use of drugs or alcohol and that a layperson would reasonably believe that the reported condition is a drug or alcohol overdose needing medical assistance").

Louisiana has a textually different standard for alcohol- than drug-overdose events. *Compare* La. Rev. Stat. Ann. § 14:403.9(A)(1) (directing peace officer not to take person into custody for "offense involving alcohol" if the peace officer "*reasonably believes*" that the person in good faith "requested emergency medical assistance for an individual who *reasonably appeared* to be in need of medical assistance" (emphases added)), *with* La. Rev. Stat. Ann. § 14:403.10(B)(1) (providing immunity for drug-possession offenses for "person who *experiences* a drug-related overdose and is in need of medical assistance" (emphasis added)). *But see Rowe*, 354 So. 3d at 1195 (harmonizing those two code sections by imposing a reasonable-person gloss on § 14:403.10(B)).

[10] *Cf. Allison v. Brown*, 293 Va. 617, 629 n.5 (2017) (describing an "objective standard" in the context of informed-consent law by reference to what "a reasonably prudent person in the plaintiff's position" would have done, while a "subjective standard" asks what "*this patient*" would have done); *Pergolizzi v. Bowman*, 76 Va. App. 310, 338 (2022) (noting that the objective standard may still account for the party's subjective belief in determining what a reasonable person in the same position would have done).

The third possible standard would be a subjective one: did the defendant subjectively believe that he was overdosing or that the victim for whom he sought medical assistance was overdosing?  As the Commonwealth acknowledged at oral argument, several State medical-amnesty laws use a subjective standard.  For instance, Florida's law immunizes a person who seeks medical assistance for himself if the defendant "experiences, or has *a good faith belief that he or she is experiencing*, an alcohol-related or a drug-related overdose and receives medical assistance."  Fla. Stat. Ann. § 893.21(3) (emphasis added).  A similar standard applies when the defendant seeks medical assistance for a third person "believed to be experiencing" an overdose.  *Id*. § 893.21(1).  Maine uses the term "suspected drug-related overdose" in its immunity statute.  Me. Rev. Stat. Ann. tit. 17-A, § 1111-B.  And Texas uses "possible overdose" in its affirmative-defense statutes.  *See, e.g.*, Tex. Health & Safety Code Ann. §§ 481.115(g), 481.041(e).

Which of those three standards best describes Virginia's medical-amnesty statute?  Virginia extends medical amnesty to a defendant who, "in good faith, seeks or obtains emergency medical attention (a) for himself, if he is experiencing an overdose, or (b) for another individual, if such other individual is experiencing an overdose."  Code § 18.2-251.03(B)(1)(i).  Immunity is also available to a defendant who "is experiencing an overdose and another individual, in good faith, seeks or obtains emergency medical attention for such individual."  Code § 18.2-251.03(B)(1)(ii).  Virginia is not alone.  Eight other States use variations of the

- 18 -

"experiencing an overdose" formulation in their medical-amnesty laws.[11] Courts in those jurisdictions have not yet determined, however, whether such language imposes a subjective standard, a reasonable-person standard, or a scientifically objective standard.

The three-judge panel here divided on that question. *Compare Morris*, 75 Va. App. at 268-77 (opinion by Raphael, J.), *with id.* at 290-96 (Russell, J., dissenting). I continue to believe that it creates a subjective standard for the reasons explained before. But I acknowledge that reasonable jurists can disagree about that.

In light of that uncertainty, our General Assembly may wish to clarify whether *experiencing an overdose* calls for a subjective or an objective standard. It could make unmistakably clear that the standard is subjective. For instance, Florida's statute asks whether the defendant "has a good faith belief that he or she is experiencing" an overdose, Fla. Stat. Ann. § 893.21(2), a subjective inquiry. It could adopt a reasonable-person standard, like most of our sister States have done. *See supra* note 9. Or it could follow Justice Crain's dissenting view in *Rowe* and make clear that scientific evidence of an actual overdose is required.

Without such clarification, however, doubt will linger. The Attorney General pointed out during our en-banc argument that the General Assembly used a "believed to be experiencing" formulation in a different part of the Code; Code § 54.1-3408 authorizes medical professionals in specified cases to "dispense naloxone or other opioid antagonist . . . for overdose reversal to a

---

[11] *See* Ariz. Rev. Stat. Ann. § 13-3423(A) ("someone experiencing a drug-related overdose"); Idaho Code Ann. § 37-2739C(2) ("experiences a drug-related medical emergency"); Ohio Rev. Code Ann. § 2925.11(B)(2)(a)(viii) ("who is experiencing a drug overdose"); Mass. Gen. Laws Ann. ch. 94C, § 34A(b) ("who experiences a drug-related overdose"); N.J. Stat. Ann. § 2C:35-30(a), (b)(1) ("someone experiencing a drug overdose"); N.J. Stat. Ann. § 2C:35-31(a) ("who experiences a drug overdose"); N.M. Stat. Ann. § 30-31-27.1(B) ("who experiences an alcohol- or drug-related overdose"); R.I. Gen. Laws § 21-28.9-4(a) ("someone experiencing a drug or alcohol overdose"); Wash. Rev. Code Ann. § 69.50.315(2) ("who experiences a drug-related overdose").

person who is *believed to be experiencing* or about to experience a life-threatening opioid overdose." Code § 54.1-3408(X) (emphasis added). Our jurisprudence has often noted that such drafting differences are meaningful.[12] The omission of that believed-to-be-experiencing formulation in Code § 18.2-251.03 unquestionably adds doubt to how our medical-amnesty statute should be interpreted.[13]

Today's en-banc decision leaves these important questions for another day. The answer will have to come through future litigation or, better yet, clarifying language from the General Assembly.

## III.

Another question raised by this case but not answered today is who bears the burden of proof when determining whether the defendant is entitled to immunity. Courts in other States have divided on that issue. *Compare People v. Harrison*, 465 P.3d 16, 23 (Colo. 2020) ("[T]he prosecution must prove beyond a reasonable doubt that the defendant's conduct was not legally authorized by the affirmative defense."), *with People v. O'Malley*, 183 N.E.3d 928, 935-36 (Ill. App. Ct. 2021) (imposing burden of production and persuasion on defendant), *appeal denied*, 175 N.E.3d 148 (Ill. 2021), *State v. W.S.B.*, 180 A.3d 1168, 1183 (N.J. Super. Ct. App.

---

[12] *See, e.g.*, *Morgan v. Commonwealth*, ___ Va. ___, ___ (Dec. 29, 2022) ("[W]hen the General Assembly has used specific language in one instance but omits that language or uses different language when addressing a similar subject elsewhere in the Code, [the Court] must presume that the difference in the choice of language was intentional." (second alteration in original) (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011))).

[13] The absence of such language, however, does not necessarily prove that the unadorned "experiencing an overdose" formulation is an objective one. It simply begs the question of whether the unadorned version imposes a subjective standard to begin with. Even assuming that the standard is objective, that still would not tell us whether to apply a scientifically objective standard or a reasonable-person standard. Any doubt about the proper construction, moreover, would have to be resolved in favor of the defendant under both the rule of lenity and the doctrine of liberally construing remedial statutes. *See Morris*, 75 Va. App. at 273-74.

Div. 2018) (same), *and State v. Williams*, 888 N.W.2d 1, 6 (Wis. Ct. App. 2016) (same). That question was not answered here because both sides assumed that Morris bore the burden of proving his entitlement to immunity under the statute. *See Morris*, 75 Va. App. at 280 n.10.

A related question is whether it makes any practical difference that the 2020 amendment, 2020 Va. Acts ch. 1016, changed Virginia's medical-amnesty law from an "affirmative defense" statute to one that makes the defendant "immune from prosecution," Code § 18.2-251.03(E). That immunity means that a covered defendant will not be "subject to arrest or prosecution" on drug- or alcohol-possession charges. Code § 18.2-251.03(B). It is unclear, however, how that apparently stronger protection works in practice.

Still, the parties' assumption here that the defendant bears the burden of production and persuasion was probably correct under Code § 18.2-263. That statute imposes "the burden of proof" on the defendant to establish "any exception, excuse, proviso, or exemption contained in this article [Article 1, Drugs] or in the Drug Control Act [Code §§ 54.1-3000 to -3472]." Code § 18.2-263. The medical-amnesty statute resides in Article 1 of title 18.2. So Code § 18.2-263 appears to impose the burdens of both production and persuasion on the defendant. The General Assembly did not say otherwise when it converted the medical-amnesty law from an affirmative-defense statute to an immunity statute.

When the defendant bears the burden of persuasion, it is perilous to proceed by proffer, as Morris did here. The statute calls for an inquiry into whether the alleged-overdose condition was one "resulting" from drug or alcohol use, Code § 18.2-251.03(A), whether the defendant "in good faith" sought emergency medical attention, § 18.2-251.03(B)(1)(i), and whether the defendant or the person for whom he was seeking emergency attention was "experiencing an overdose," *id.* As Judge Callins demonstrates in her concurrence, these issues may involve tricky causation questions. Given the array of elements needed to establish immunity, an

- 21 -

evidentiary hearing may provide a better vehicle than a proffer to enable the factfinder to see the evidence, hear the witnesses' testimony, and make appropriate factual findings and credibility determinations.

IV.

Today's decision also leaves open for another day the extent to which drug-induced suicidal ideation qualifies as an "overdose" within the meaning of the statute. All members of the prior three-judge panel agreed that suicidal ideation *may* qualify, depending on the circumstances. *See Morris*, 75 Va. App. at 277-78 & n.9 (opinion by Raphael, J., joined by Ortiz, J.); *id.* at 297 n.24 (Russell, J., dissenting). The Commonwealth agreed, as long as a clear causal link is shown. *See* Brief for the Commonwealth En Banc at 32 n.16 ("The Commonwealth's position is . . . that suicidal ideations cannot satisfy the statute (absent a showing of a direct causal, perhaps neurological, link).").

States have taken different approaches to defining "overdose" in their medical-amnesty laws. Virginia's statute defines an overdose by reference to a measurable standard: "*a life-threatening condition* resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances." Code § 18.2-251.03(A) (emphasis added). Several States use a similar standard. *See, e.g.*, Alaska Stat. § 11.71.311(b) ("life-threatening emergency"); 720 Ill. Comp. Stat. Ann. 570/414(a) ("life-threatening emergency"). Other States identify conditions short of life-threatening ones that also qualify as an overdose, such as an "acute medical condition" that might result in "disability" or "serious injury," Cal. Health & Safety Code § 11376.5(e); "an acute condition" that "a layperson would reasonably believe requires medical assistance," N.H. Rev. Stat. Ann. § 318-B:28-b(I)(a); or simply "a condition a layperson would reasonably believe to be a drug overdose requiring immediate medical assistance," N.D. Cent. Code § 19-03.1-23.4.

- 22 -

Many States have defined an overdose by creating a list of conditions that qualify. For instance, Arkansas defines an overdose as a drug- or alcohol-induced "acute condition . . . including without limitation: (A) Extreme physical illness; (B) Decreased level of consciousness; (C) Respiratory depression; (D) Coma; (E) Mania; or (F) Death." Ark. Code Ann. § 20-13-1703(1). Most States using this approach, like Arkansas, make clear that the listed symptoms are only examples of overdose conditions, not an exclusive list.[14] Although none of our sister States specifically mentions suicidal ideation when listing such examples, twenty States include "mania."[15] And more than a dozen of those list "hysteria" as well.[16]

Some States follow a hybrid approach, combining a standard that defines when an overdose occurs with a list of sample conditions. Some follow an *either-or* model. Hawaii, for

---

[14] *See* Colo. Rev. Stat. § 18-1-711(5) ("including, but not limited to"); Del. Code Ann. tit. 16, § 4769(a)(2) (same); Ga. Code Ann. § 16-13-5(a)(1) (same); Iowa Code § 124.418(1)(a) (same); Minn. Stat. Ann. § 604A.05, Subd. 5 ("an acute condition, including"); Miss. Code Ann. § 41-29-149.1(2)(a) ("including, but not limited to"); Mo. Rev. Stat. § 195.205(1)(1) (same); W. Va. Code § 16-47-3(1) (same). *But see* D.C. Code § 7-403(i)(3) ("an acute condition of physical illness, coma, mania, hysteria, seizure, cardiac arrest, cessation of breathing, or death, which is or reasonably appears to be the result of consumption or use of drugs or alcohol and relates to an adverse reaction to or the quantity ingested of the drugs or alcohol, or to a substance with which the drugs or alcohol was combined").

[15] *See* Ark. Code Ann. § 20-13-1703(1)(E); Colo. Rev. Stat. § 18-1-711(5); Del. Code Ann. tit. 16, § 4769(a)(2); D.C. Code § 7-403(i)(3); Ga. Code Ann. § 16-13-5(a)(1); Haw. Rev. Stat. § 329-43.6(a)(1); Ky. Rev. Stat. Ann. § 218A.133(1)(a); Mich. Comp. Laws §§ 333.7403(7)(a), 333.7404(6)(a); Minn. Stat. Ann. § 604A.05, Subd. 5; Miss. Code Ann. § 41-29-149.1(2)(a); Mo. Rev. Stat. § 195.205(1)(1); Neb. Rev. Stat. § 28-472(6); N.C. Gen. Stat. Ann. § 90-96.2(a); Nev. Rev. Stat. § 453C.150(5); N.Y. Penal Law §§ 220.78(3)(a), 90-96.2(a); Or. Rev. Stat. Ann. § 475.898(7)(b); 35 Pa. Cons. Stat. § 780-113.7(f); S.C. Code Ann. § 44-53-1910(2); S.D. Codified Laws § 34-20A-109(1); Tenn. Code Ann. § 63-1-156(a)(2); W. Va. Code § 16-47-3(1).

[16] *See* Colo. Rev. Stat. § 18-1-711(5); Del. Code Ann. tit. 16, § 4769(a)(2); D.C. Code § 7-403(i)(3); Ky. Rev. Stat. Ann. § 218A.133(1)(a); Minn. Stat. Ann. § 604A.05, Subd. 5; Neb. Rev. Stat. § 28-472(6); Or. Rev. Stat. Ann. § 475.898(7)(b); 35 Pa. Cons. Stat. § 780-113.7(f); N.Y. Penal Law §§ 220.78(3)(a), 90-96.2(a); N.C. Gen. Stat. Ann. § 90-96.2(a); S.C. Code Ann. § 44-53-1910(2); S.D. Codified Laws § 34-20A-109(1); W. Va. Code § 16-47-3(1).

example, defines a drug or alcohol overdose as *either* (1) "A condition, including but not limited to extreme physical illness, decreased level of consciousness, respiratory depression, coma, mania, or death, that is the result of consumption or use of a controlled substance or alcohol," *or* (2) "A condition that a layperson would reasonably believe to be a drug or alcohol overdose that requires medical assistance." Haw. Rev. Stat. § 329-43.6(a).[17] Other States require both showings. Thus, Kentucky defines an overdose as "[1] an acute condition of physical illness, coma, mania, hysteria, seizure, cardiac arrest, cessation of breathing, or death which reasonably appears to be the result of consumption or use of a controlled substance . . . *and* [2] that a layperson would reasonably believe requires medical assistance." Ky. Rev. Stat. Ann. § 218A.133(1)(a) (emphasis added).[18]

The General Assembly, of course, is better suited than the judiciary to decide whether *overdose* is best defined by a standard, a list of conditions, or both. It is also best suited to evaluate the medical evidence surrounding the connection between drug use and acute medical conditions, including suicidal ideation. In the meantime, under the standard in our current medical-amnesty law, an urge to kill oneself—at least depending on the degree of the impulse and its causal relation to the drugs ingested—certainly appears to qualify as an overdose

---

[17] For States with similar *either-or* approaches, see Mich. Comp. Laws §§ 333.7403(7)(a), 333.7404(6)(a); Nev. Rev. Stat. § 453C.150(5); N.Y. Penal Law § 220.78(3)(a); 35 Pa. Cons. Stat. § 780-113.7(f).

[18] For other States using this *both-and* approach, see Neb. Rev. Stat. § 28-472(6); N.C. Gen. Stat. Ann. § 90-96.2(a); Or. Rev. Stat. Ann. § 475.898(7)(b); S.C. Code Ann. § 44-53-1910(2); S.D. Codified Laws § 34-20A-109(1); Tenn. Code Ann. § 63-1-156(a)(2).

condition—"a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances." Code § 18.2-251.03(A).

* * *

In a recent report mandated by Congress, the General Accounting Office reviewed 17 studies on the effectiveness of State "Good Samaritan Laws." *See* Government Accounting Office, *Most States Have Good Samaritan Laws and Research Indicates They May Have Positive Effects* (Mar. 2021), https://www.gao.gov/assets/gao-21-248.pdf.[19] The GAO "found a consistent pattern between enactment of Good Samaritan laws and lower rates of overdose deaths," but "the effectiveness of these laws is likely to vary across jurisdictions based on several factors." *Id.* at 25. Those factors include "public awareness of Good Samaritan laws," the public's "willingness to call 911," and "law enforcement knowledge." *Id.* at 25-27. The GAO also noted that State laws differ across the country in whether they offer immunity from arrest or prosecution, an affirmative defense to criminal liability, or a mitigating factor in sentencing. *Id.* at 12. The report did not identify any data, however, to illuminate how differences among State laws might correlate with reduced overdose deaths.

Predicting that relationship calls for legislative judgment that falls outside the judiciary's wheelhouse. This case has identified some of the key interpretive questions that remain open under Virginia's medical-amnesty law. Future cases may provide the opportunity to litigate them. But the General Assembly is in the best position to provide definitive answers. And it can do so by making judgments that we cannot make, given that our "judicial review does not

---

[19] The GAO report was required by the Comprehensive Addiction and Recovery Act of 2016, § 703, Pub. Law No. 114-198, 130 Stat. 695, 741 (2016). The Act defined a "Good Samaritan law" as "law of a State or unit of local government that exempts from criminal or civil liability any individual who administers an opioid overdose reversal drug or device, or who contacts emergency services providers in response to an overdose." *Id.* § 703(b)(3)(1).

evaluate 'the propriety, wisdom, necessity and expediency of legislation.'" *Appalachian Power Co. v. State Corp. Comm'n*, ___ Va. ___, ___ (Aug. 18, 2022) (quoting *Willis v. Mullett*, 263 Va. 653, 658 (2002)).

Callins, J., concurring in the judgment.

I agree with the majority that Morris does not meet the requirements to qualify for immunity under Code § 18.2-251.03. But I write separately because I see narrower grounds upon which to affirm the trial court's judgment. *See Commonwealth v. White*, 293 Va. 411, 419 (2017) ("As we have often said, '[t]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (alteration in original) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015))). The majority holds that Morris does not qualify for immunity because he left the "scene of the overdose," in contravention of Code § 18.2-251.03(B)(2). I would hold that Morris's proffer was insufficient to establish a causal nexus between his ingestion of a controlled substance and the overdose. *See* Code § 18.2-251.03(A).

Affirming on this alternative ground would foreclose the need to grapple with the grammar in the (B)(2) requirement in Code § 18.2-251.03. The majority's interpretation of this requirement would render the entire statute inconsistent. *See Oraee v. Breeding*, 270 Va. 488, 498 (2005) ("[W]e have a duty, whenever possible, 'to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal.'" (quoting *Va. Elec. & Power Co. v. Bd. of Cnty. Supervisors of Prince William Cnty.*, 226 Va. 382, 388 (1983))). Thus, this narrower pathway to an affirmance would "affect[] the least number of cases," *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020), and align with our commitment to judicial restraint.

I. <u>The trial court did not err in finding that Morris does not meet the requirements to qualify for immunity under Code § 18.2-251.03.</u>

Upon hearing argument on the application of Code § 18.2-251.03, the trial court posed the following questions to counsel:

> [E]ven if it's determined that [Morris] is suicidal . . . does there not
> have to be [s]ome kind of causation between the suicidal thoughts

- 27 -

and the overdose as opposed to some other reason? . . . Is there a requirement that the suicidal thoughts life threatening situation was caused by drugs and the overdose situation?

The trial court was unconvinced by Morris's affirmative answer. Indeed, the trial court expressly found that Morris's proffer failed to show that Morris's suicidal ideations were caused by his ingestion of drugs. The trial court concluded,

> But even though he said that he was ingesting, even though he said he was thinking about killing himself, does not mean he was suicidal in and of itself. I think there has to be something a little bit more than just his expression that he's thinking about killing himself and that he's thinking about that because of the use of drugs.
>
> [Morris is] a lay person. . . . [H]e doesn't have the qualifications from the facts presented to the Court to make that determination. No more than somebody showing up and saying my arm hurts, I have a pain in my heart region, because I ate something this morning. No, the doctor is going to run tests and make sure it's not a heart attack. Just because a patient shows up at the emergency room and says they have a symptom because of something else, does not make it so. And the Court cannot rely on that to make a legal determination.
>
> So for those reasons, I am going to find that Mr. Morris has failed to establish that he was experiencing a life-threatening condition such that he can receive the benefit of Code Section 18.2-251.03.

The trial court did not go so far as to state that expert testimony is required to establish a causal link between the ingestion of a drug and overdose.[20] But neither did the trial court find that

---

[20] Notwithstanding the trial court's comments, it also noted that it only had available to it the proffer of Morris's "expression" and explained that "there has to be something a little bit more than just his expression that he's thinking about killing himself and that he's thinking about that because of the use of drugs." Affirming the trial court's finding that there was insufficient evidence included in Morris's proffer to establish a causal link does not foreclose the possibility that such a link could be established with non-medical evidence.

In addition, the trial court found that expert testimony is not a necessary prerequisite to establish an overdose, stating,

Morris's proffer laid an evidentiary foundation sufficient to support his claim. The trial court did not err in its finding that Morris did not qualify for the protections under Code § 18.2-251.03 because the evidence did not establish a firm causal link showing that Morris's drug use caused the suicidal ideation.[21] While it is true that the two occurrences—the drug use and the suicide ideation—were bounded together by time, the evidence falls short of showing a connection between the two. And although, according to the proffer, Morris connected the drug use and the suicidal ideations, the factfinder was entitled to disbelieve this uncorroborated tender. *See Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011). The evidence offered no insight into when the onset of suicidal thoughts occurred and what precise role, if any, the drugs had in causing those thoughts.

II. An alternative interpretation of (B)(2) that effects the intent of the legislature.

Rather than affirming on this ground, the majority stakes its analysis on Code § 18.2-251.03(B)(2), holding that "[t]o receive immunity from prosecution, the statute required

---

> I'm not going to go so far as to say that [evidence of a life-threatening condition] can only be presented through medical personnel so that anybody presenting this motion has to summons a doctor to Court. And it doesn't have to be satisfied with direct evidence. I think you can infer from the evidence that there is a life-threatening situation.

Although I would hold that medical evidence is unnecessary to find either that an overdose has taken place or a causal nexus between ingestion of a drug and an overdose, under these circumstances, the trial court's findings were supported by the evidence before it.

[21] It is because Morris did not request an evidentiary hearing that the evidence before the trial court was limited to Morris's deficient proffer. As it did here, a trial court may find such a proffer insufficient to show that Code § 18.2-251.03 applies, if it fails to establish a causal link between an overdose and drug use. *Cf. McCarthy v. Commonwealth*, 73 Va. App. 630, 649 (2021) ("Because that person could no longer be 'subject to arrest or prosecution' under the current version of the statute, the person would at a minimum be able to seek some sort of pre-trial relief when the prosecution is initiated and need no longer wait until trial to prove an affirmative defense.").

- 29 -

Morris to remain wherever he began experiencing the drug-induced life-threatening condition."

As recognized, (B)(2) requires that an individual "remain[] at the scene of the overdose or at any alternative location to which he or the person requiring emergency medical attention *has been* transported . . . ." Code § 18.2-251.03(B)(2) (emphasis added). But for two reasons, I find that the majority has settled on an interpretation of (B)(2) that essentially defeats the intent and purpose of the legislature in enacting the statute, that is—as this Court unanimously agrees—to save lives.

*a. The (B)(2) and (B)(1) requirements must be harmonized.*

First, the majority focuses on the use of the passive "has been" to hold that Morris cannot receive immunity under the statute because he drove *himself* to the hospital. While the majority's interpretation of (B)(2) passes grammatical muster, it strictly adheres to the rules of grammatical voice to the detriment of the entire statute. This interpretation of the (B)(2) requirement fails to harmonize with other provisions in the statute. Specifically, (B)(1) provides that the statute applies if "[s]uch individual (i) in good faith, *seeks or obtains emergency medical attention (a) for himself, if he is experiencing an overdose* . . . ." Code § 18.2-251.03(B)(1) (emphasis added). (B)(1) allows individuals to receive immunity if they seek or obtain emergency medical attention for themselves when experiencing an overdose. Focusing on the phrase "has been transported" in (B)(2) significantly impinges on (B)(1)'s protections for individuals seeking or obtaining emergency medical care, where seeking or obtaining that care would require leaving the scene of the overdose.

Under the majority's interpretation, a person who overdoses a block away from a hospital would not be able to walk over to the hospital to receive help and still receive protection under the statute. Similarly, a lone individual who overdoses without access to a phone or a cellular signal, and thus without the ability to call for help, could not seek or obtain needed emergency

- 30 -

medical care without forfeiting immunity under Code § 18.2-251.03. These examples reveal the friction between the majority's reading of (B)(2) and the protections in (B)(1).

As the majority notes, the statute's "clear purpose" is to "encourage . . . prompt emergency medical treatment [for] those who have suffered an overdose as a result of ingesting a controlled substance." *Broadous v. Commonwealth*, 67 Va. App. 265, 271 (2017). The majority's holding conflicts with this legislative goal. Its reading of the statute would preclude individuals from seeking or obtaining the emergency medical attention provided for in (B)(1), rather than facilitate it, leaving those individuals in the same position that they would have been in the statute's absence. As such, this reading is neither consistent with (B)(1) nor with the broader legislative goals encoded into Code § 18.2-251.03.

"[W]hile legislative intent 'must be gathered from the words used, . . . unreasonable or absurd results must not be reached by too strict adherence to literal interpretation.'" *Colbert v. Commonwealth*, 47 Va. App. 390, 394 (2006) (second alteration in original) (quoting *Buzzard v. Commonwealth*, 134 Va. 641, 653 (1922)). The majority's strict reading of (B)(2) results in an inconsistency that impairs (B)(1), without an explanation of why the phrase "has been transported" should take precedence over "seeks or obtains emergency medical attention." The majority acknowledges if there were "context suggesting the legislature intended a different result," it would impact their construction of (B)(2). The plain language of (B)(1) supplies ample evidence that the legislature intended a different result. *See Delaune v. Commonwealth*, 76 Va. App. 372, 381 (2023) ("[O]ur primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." (alteration in original) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012))); *see also Colbert*, 47 Va. App. at 394 ("The proper course [in] all these cases is to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with

the context, and promotes in the fullest manner the apparent policy and objects of the legislature." (alteration in original) (quoting *Jones v. Rhea*, 130 Va. 345, 372 (1921))).

Accordingly, this strict adherence to literal interpretation renders a result that gives priority to grammatical voice over the substantive terms of the statute, using the statute's reliance on the passive voice to vitiate (B)(1) to a point such that what remains is a near husk of a statute, which fails to deliver on the legislature's intent. However, there is an alternative that avoids rendering the statute internally inconsistent. Rather than use The Chicago Manual of Style to fashion an interpretation of (B)(2)'s use of the passive voice that impairs the statute, it is possible to harmonize the substantive, *clear* terms of (B)(1) with (B)(2)'s use of the passive voice by finding that (B)(2) echoes or amplifies (B)(1). This interpretive approach gives utility to both subdivisions as opposed to rendering the earlier (B)(1) meaningless in light of the latter (B)(2). Thus, I would take a harmonizing approach to interpret (B)(2)'s use of the passive voice in light of the clear terms in (B)(1), holding that individuals who transport *themselves* to an alternative location for medical attention satisfy the requirement in (B)(2) that "[s]uch individual remain[] at the scene of the overdose or at any alternative location to which he . . . has been transported[.]" Code § 18.2-251.03(B)(2).

> b. *The majority's interpretation of (B)(2) is unworkable on its own terms.*

Second, even as it acknowledges that pinning down the precise location of Morris's overdose sets before this Court an impracticable task, the majority nevertheless opines that "the purported overdose was necessarily a location where Morris was *before* he decided to seek medical care, and thus somewhere *other* than where he stopped the car in the middle of the road next to the emergency room." This holding assumes that the "scene" of an overdose can be neatly delimited and traced to a geographically bounded location, a single set of coordinates on a

- 32 -

map.  But Morris may have begun experiencing the purported overdose in a vehicle,[22] which, by its nature, is mobile.  It is imaginable that there are circumstances in which the "scene" of an overdose is transitory rather than immobile.

However, in holding both that "an individual experiencing an overdose [must] remain at the location where the 'life-threatening condition' began" and that Morris did not meet the (B)(2) requirement in Code § 18.2-251.03, the majority implicitly rejects the possibility of a transitory overdose scene.  Such rejection fashions a standard that will ultimately prove unworkable.  Trial courts will be required to perform the impossible task of teasing out the *fixed* location of where an overdose began, even where a defendant was in a vehicle, *on the move*.  And, even where a defendant is not experiencing an overdose in a vehicle, the majority interpretation requires that trial courts draw clear lines around the "scene" of an overdose, by requiring that they pinpoint the place of its beginning.

The ingestion of a drug is not the same as an overdose.  The two may happen in quick succession, but they may not.  It is also imaginable that an individual experiencing an overdose may not have the cognitive awareness needed to *stay* in the location where that overdose began.  Requiring that trial courts sift through this morass and determine the precise location where an overdose began is no more reasonable than requiring that an individual experiencing an overdose stay at the location of the overdose, even when doing so may result in fatality or may be

---

[22] The record lends credence to this inference.  According to his proffer, Morris first began experiencing suicidal ideations "in his boss's car," while on the phone with his mother. Then, while driving, Morris decided to go to the emergency room because "he was thinking about suicide."  The suicide ideations are what triggered the life-threatening condition.  Morris experienced the ideations in the vehicle.

otherwise infeasible.  A harmonizing interpretation of the statute would obviate such outcomes and, in turn, better serve trial courts, defendants, and the statute itself.

It is for these reasons that I concur in judgment only.

Chaney, J. dissenting from the judgment.

The General Assembly intended Code § 18.2-251.03 to save lives by encouraging persons who have a good faith belief that they are experiencing a life-threatening condition due to a drug overdose to seek medical treatment without fear of criminal prosecution. However, the majority's unreasonably narrow construction of Code § 18.2-251.03 would eliminate immunity for those who either walk a few blocks to an emergency room or otherwise transport themselves to a hospital after a drug overdose. To arrive at this counter-intuitive construction, the majority exploits a grammatical awkwardness and arrives at counter-intuitive results because the location of the overdose is wherever someone has a good faith belief that they have a life-threatening condition relating to the ingestion of drugs. The only purpose of the statutory clause relating to being transported is to require that the person seeking immunity not leave the scene for the purpose of interfering with law enforcement since cooperation with law enforcement is required. It is undisputed that Morris brought himself to law enforcement's attention and cooperated. Thus, I respectfully dissent.

*VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **6th** *day of* **September, 2022**.

Jordan Darrell Morris, Appellant,

against          Record No. 1194-21-2
                   Circuit Court No. CR21-1545-00F

Commonwealth of Virginia, Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, Atlee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White

On August 16, 2022 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on August 2, 2022, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court. The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,

Teste:

A. John Vollino, Clerk

By:    *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

COURT OF APPEALS OF VIRGINIA

Present: Judges Russell,[*] Ortiz and Raphael
Argued at Richmond, Virginia

PUBLISHED

JORDAN DARRELL MORRIS

                                                     OPINION BY
   v.        Record No. 1194-21-2           JUDGE STUART A. RAPHAEL
                                                 AUGUST 2, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Randall G. Johnson, Jr., Judge

H. Pratt Cook, III (Law Office of H. Pratt Cook, III, on brief), for
appellant.

Stephen J. Sovinsky, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

This case presents two questions of first impression concerning Virginia's medical-

amnesty statute, Code § 18.2-251.03, which shields from arrest or prosecution those persons who

seek emergency medical assistance because they are experiencing a drug overdose (or who seek

emergency medical assistance for others who are experiencing an overdose). First, suppose the

defendant seeking emergency medical assistance *subjectively* believes he is suffering a drug

overdose, but in fact he is not. Is the defendant entitled to amnesty, or must the trier of fact be

satisfied that the defendant, *objectively*, is having an overdose? We conclude from the statute's

plain language that the General Assembly intended a subjective standard.

Second, does drug-induced suicidal ideation qualify as an "overdose" under the statute?

We conclude that it does. While an "overdose" from drugs in common parlance may not

---

[*] Justice Russell participated in the hearing and prepared the dissent in this case prior to
his investiture as a Justice of the Supreme Court of Virginia.

embrace the desire to kill oneself, the statute defines "overdose" as "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances." Code § 18.2-251.03(A). A drug-induced impulse to kill oneself is "a life-threatening condition" under that definition.

Because the circuit court erred in applying an objective standard to the defendant's claim that he was seeking emergency medical care for his drug-induced suicidal ideation, we vacate the drug-possession conviction and remand this case for the trial court to determine whether the defendant is entitled to medical-amnesty immunity under the correct legal standard.

BACKGROUND

Appellant Jordan Darrell Morris was arrested on November 16, 2020, outside the Short Pump emergency room, and charged with possession of a Schedule I or II controlled substance (in violation of Code § 18.2-250) and driving under the influence of drugs, first offense (in violation of Code § 18.2-266). He was released from jail on a $1,400 recognizance bond.

On June 16, 2021, the Commonwealth gave notice of its intent to use at trial a lab analysis showing that Morris's blood tested positive for cocaine and that cocaine residue was found on a smoking device in the car he was driving. Morris, represented by counsel, moved to suppress the drug evidence and to dismiss the drug-possession charge under the medical-amnesty provision of Code § 18.2-251.03. Morris argued that he "was actively seeking medical care for himself when the Henrico police developed the evidence against him." The motion recited that

> Morris was trying to seek medical attention at Short Pump Emergency Room when he stopped the vehicle in the middle of the roadway adjacent to the emergency hospital. Henrico police officers Cirillo and Steelman observed that Morris was under the influence of drugs, and Morris told them he had recently smoked crack cocaine. Morris told the officers he was contemplating suicide because of drugs and made suicidal statements at the hospital.

- 2 -

The Commonwealth's written opposition asserted that Morris "had produced no evidence or testimony from any medical personnel present that evening, nor any other evidence, that he was experiencing an overdose."

On July 15, the trial court conducted a hearing on Morris's suppression motion and motion to dismiss, at which both sides "agreed to proffer the facts." Paraphrasing the police report, Morris's counsel represented that Henrico police officers observed a white Ford Edge trying to turn onto the road adjacent to the Short Pump emergency room. The vehicle nearly struck a curb in the turn lane and stopped in the middle of the road, blocking through-traffic. Officers Cirillo and Steelman approached the vehicle, driven by Morris, and asked him to park the car. Morris said that "he was there to get help," telling the officers that he had smoked crack cocaine. The officers escorted Morris into the emergency room.

As medical personnel drew a blood sample, Morris "made suicidal statements." In response to questions from a third policeman, Officer Foley, Morris said that he worked at Food Lion; he had asked to sit in his boss's car to call his mother; he had called his mother "because he was thinking about committing suicide"; he had driven away from the Food Lion and had driven around awhile before heading to the Short Pump emergency room. When asked whether his mother had told him to "go to the ER," Morris said he "chose to do so himself" because "he was thinking about suicide." When Foley asked, why suicide, Morris responded, "drugs." Morris said that he had used heroin, fentanyl, and cocaine, that he had smoked crack cocaine in his boss's car, and that he "came to the ER to get help for the suicidal thoughts and his drug problem." Morris alerted the officers to a crack pipe in the vehicle, which they found tucked in the crevice of the passenger seat.

- 3 -

The Commonwealth initially disagreed with certain aspects of the proffer. Pressed by the trial court, however, the Commonwealth agreed to "the Defense version" to the extent there were any inconsistencies.[1]

Both parties treated the statute as creating an "affirmative defense" to be proven by the defendant. The Commonwealth argued that Morris was required to present expert testimony that he was in fact experiencing an overdose and that it was not enough to simply take his word for it. Morris's counsel argued that the immunity statute applied because the lab tests showed cocaine in Morris's blood, Morris drove himself to the emergency room seeking treatment, and he said three times that he was suicidal because of his drug use.

Ruling from the bench, the trial court denied Morris's motions to suppress the drug evidence and to dismiss the drug-possession charge. The court saw "no evidence that [Morris] was experiencing a life-threatening condition." It was "not going so far as to say" that a medical professional had to be called as a witness to prove an overdose—circumstantial evidence could suffice. But the court found the proffer insufficient. "[J]ust because" the drugs "affected his behavior [did] not mean we're in a life-threatening situation." The court said there must be

---

[1] Both the Commonwealth and Morris argue on brief that we should view the facts in the "light most favorable" to the Commonwealth, the prevailing party below. But "[w]e do not permit litigants 'to define Virginia law by their concessions.'" *Butcher v. Commonwealth*, 298 Va. 392, 395 (2020) (quoting *Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 454 n.6 (2013)). The facts considered by the trial court were based on an oral proffer by defense counsel, to which the prosecutor agreed. *Cf. Massenburg v. City of Petersburg*, 298 Va. 212, 216-17 (2019) (explaining that the standard of appellate review of a ruling on a plea in bar depends on whether evidence was heard below). The dissent argues that the light-most-favorable standard applies because the parties stipulated the facts. But that conclusion does not follow from the premise. *See Farmer's Ins. Exchange v. Enters. Leasing Co.*, 281 Va. 612, 617 (2011) (stating that, where the circuit court granted "summary judgment relying on stipulated facts," appellate courts "review de novo the circuit court's application of the law to the undisputed facts"). Because we vacate the drug-possession conviction and remand this case for further proceedings, and because the factual nuances of the proffer do not control the outcome, we need not decide whether the light-most-favorable standard is appropriate.

"some showing" that Morris's expression of wanting to kill himself "was caused by the ingestion of cocaine and this overdose situation."

Morris subsequently pleaded no contest to the charges against him, reserving his right to appeal the immunity ruling on the drug-possession charge. The trial court accepted the pleas, finding Morris guilty on both charges. The court sentenced Morris to five years' incarceration on the drug-possession charge, suspending all but two months. It sentenced him to twelve months (all suspended) on the driving-under-the-influence charge.

Morris now appeals the trial court's decision denying him medical-amnesty immunity on the drug-possession charge (Case No. CR21-1545-00F).[2]

STANDARD OF REVIEW

The proper interpretation of Code § 18.2-251.03 is a question of law that we review *de novo*. *E.g.*, *Citland, Ltd. v. Commonwealth ex rel. Kilgore*, 45 Va. App. 268, 275 (2005) ("Pure statutory construction, a matter within the 'core competency of the judiciary,' requires *de novo* review." (quoting *Finnerty v. Thornton Hall, Inc.*, 42 Va. App. 628, 635 (2004))); *Broadous v. Commonwealth*, 67 Va. App. 265, 268 (2017) (applying *de novo* review to interpretation of Code § 18.2-251.03).

ANALYSIS

Beginning with New Mexico in 2007, at least forty States have enacted laws providing protection from criminal liability for persons seeking emergency medical assistance for a drug overdose. *See* Nicole Schill, *The Fatal Shortcomings of Our Good Samaritan Overdose Statutes and Proposed Model Statute*, 25 Cardozo J. Equal Rts. & Soc. Just. 123, 126 (2018). We will refer to such statutes as "medical-amnesty laws," but they are also sometimes called "Good

---

[2] Morris did not appeal his driving-under-the-influence conviction (Case No. CR21-1546-00M), so that conviction is not before us.

Samaritan Overdose Laws" or "911 Immunity Laws." *Id.* at 126 n.17. Different States have taken different approaches. Some permit the summoning of medical help to be used by the defendant only "as [a] mitigating circumstance[]" at sentencing. *Id.* at 139-40 (describing Ind. Code Ann. § 35-38-1-7.1(b)(12) (West 2017)). Some permit the defendant to raise the summoning of assistance as an "affirmative defense," establishing a "justification or excuse that relieves them of criminal liability." *Id.* at 140. And some provide "immunity from criminal liability." *Id.* at 141.

Virginia's medical-amnesty statute was first enacted in 2015. 2015 Va. Acts chs. 418, 436 (codified at Code § 18.2-251.03). The original statute followed the "affirmative defense" approach. For enumerated drug- and alcohol-possession charges, the law provided, in pertinent part, "an affirmative defense . . . if [s]uch individual, in good faith, seeks or obtains emergency medical attention for himself, if he is experiencing an overdose, or for another individual, if such other individual is experiencing an overdose, by contemporaneously reporting such overdose." Code § 18.2-251.03(B)(1) (Supp. 2015). For the affirmative defense to apply, the defendant was required to remain at the scene of the overdose (or any alternative location to which the person requiring emergency medical attention was transferred); identify himself to the responding law-enforcement officer; and substantially cooperate with law enforcement in any criminal investigation relating to the substance that caused the overdose. Code § 18.2-251.03(B)(2)-(4) (Supp. 2015). The affirmative defense was limited to offenses based on evidence "obtained as a result of the individual seeking or obtaining emergency medical attention." Code § 18.2-251.03(B)(5) (Supp. 2015).

We considered the 2015 version of the statute in *Broadous*. 67 Va. App. at 268-73. We said its "clear purpose" was to provide "a 'safe harbor' from prosecution to encourage . . . prompt emergency medical treatment to those who have suffered an overdose as a result of

- 6 -

ingesting a controlled substance." *Id.* at 271. We found that the General Assembly "obviously made a policy determination that encouraging others, who may themselves be guilty of violating the laws involving controlled substances, to call 911 in an effort to save a life is more important than their prosecution." *Id.*

Nonetheless, we were constrained by the language of the statute, as it was then written, to conclude that it protected only a person who "seeks or obtains" emergency medical treatment for himself or for another. *Id.* at 270-72. Broadous was not protected under that standard because, although she had suffered a drug overdose, her boyfriend was the person who called for emergency medical assistance, not Broadous. *Id.* at 273. We observed that other States provided broader protection in their medical-amnesty statutes, extending amnesty to defendants who were the beneficiaries of emergency-medical calls made by others. *Id.* at 272 (citing Ohio Code § 2925.11(B)(2)(a)(viii)). Such protection was "absent from Virginia's statute," we said, "presumably because our legislature made a policy decision not to include it." *Id.* at 273.

After *Broadous*, the General Assembly revisited the medical-amnesty statute three times, each time expanding its protections. The 2019 amendment eliminated the requirement that the defendant must have cooperated in any criminal investigation relating to the substance that caused the overdose. 2019 Va. Acts ch. 626 (deleting Code § 18.2-251.03(B)(4)).

The 2020 amendment made two more changes. 2020 Va. Acts ch. 1016. It upgraded the nature of the amnesty from an "affirmative defense" to an immunity from "arrest or prosecution." Code § 18.2-251.03(B) (Supp. 2020). The amendment also superseded *Broadous*, expanding amnesty to protect defendants in Broadous's situation: someone who "is experiencing an overdose" when "another individual, in good faith, seeks or obtains emergency medical attention for such individual." Code § 18.2-251.03(B)(1)(ii); *see McCarthy v. Commonwealth*, 73 Va. App. 630, 646 (2021) (describing the 2020 amendments).

Finally, the 2021 amendment broadened the amnesty for good Samaritans who themselves provide medical aid to those experiencing an overdose. *See* 2021 Va. Acts, Sp. Sess. I, ch. 29 (codified at Code § 18.2-251.03(B)(1)(iii)) (shielding a person who, "in good faith, renders emergency care or assistance, including cardiopulmonary resuscitation (CPR) or the administration of naloxone or other opioid antagonist for overdose reversal, to an individual experiencing an overdose while another individual seeks or obtains emergency medical attention in accordance with this subdivision").

With that statutory framework as the backdrop, we turn to the issues presented here.

### A. *A subjective standard determines whether the person in need of emergency medical attention is experiencing an overdose.*

The parties agreed at oral argument that the trial court used an objective standard in applying Code § 18.2-251.03, requiring that Morris demonstrate that he was, in fact, experiencing drug-induced suicidal ideation. The trial court denied Morris's motion after concluding that Morris failed to carry his burden.[3]

---

[3] Morris and the Commonwealth assume that the defendant bears the burden of persuasion on medical-amnesty immunity. We have previously observed that "there is no uniform rule in Virginia regarding the burden of persuasion for affirmative defenses. Instead, the determination of which party has the burden of persuasion turns on which affirmative defense is being asserted." *Tart v. Commonwealth*, 52 Va. App. 272, 276 n.1 (2008). Courts in other jurisdictions have divided on whether the prosecution or defense bears the burden of persuasion on a medical-amnesty defense. *Compare People v. Harrison*, 465 P.3d 16, 23 (Colo. 2020) ("[T]he prosecution must prove beyond a reasonable doubt that the defendant's conduct was not legally authorized by the affirmative defense."), *with People v. O'Malley*, 183 N.E.3d 928, 935-36 (Ill. App. Ct.) (imposing burden of production and persuasion on defendant), *appeal denied*, 175 N.E.3d 148 (Ill. 2021); *State v. W.S.B.*, 180 A.3d 1168, 1183 (N.J. Super. Ct. App. Div. 2018) (same); *State v. Williams*, 888 N.W.2d 1, 6 (Wis. Ct. App. 2016) (same). But neither Morris nor the Commonwealth has briefed that question under Code § 18.2-251.03, nor have they addressed the relevance of Code § 18.2-263 (stating for referenced drug offenses that "the burden of proof of any . . . exception, excuse, proviso, or exemption shall be upon the defendant"). The parties' failure to brief this issue persuades us that we should not decide it here. *See Butcher,* 298 Va. at 395; *Logan v. Commonwealth*, 47 Va. App. 168, 172 n.4 (2005) (en banc). We therefore assume without deciding that the defendant bears the burden of proving entitlement to immunity under Code § 18.2-251.03.

The trial court erred in its analysis because the medical-amnesty statute imposes a subjective standard, not an objective one.  We reach that conclusion based on the "plain meaning" of the text and the "clear purpose of the statute," as evidenced by the text.  *Broadous*, 67 Va. App. at 271.[4]

"[W]e start with the text," *Levick v. MacDougall*, 294 Va. 283, 292 (2017), considering the statute's application to a person, like Morris, who seeks medical assistance for himself.  The statute provides immunity from arrest or prosecution for drug possession if "[*s*]*uch* individual (i) *in good faith*, seeks or obtains emergency medical attention . . . for himself, if *he is experiencing* an overdose."  Code § 18.2-251.03(B)(1) (emphasis added).  Both terms—"good faith" and "experiencing"—apply to the person seeking treatment.  That person is entitled to immunity if he is seeking medical attention "in good faith" because "he is experiencing" a drug overdose.

---

[4] The dissent would treat this issue as defaulted, claiming that Morris did not argue for a "subjective" standard on brief.  The dissent would simply hold that an objective standard governs.  In truth, however, *neither* Morris, *nor* the Commonwealth, *nor* the trial court used the terms "subjective" or "objective."  We view Morris's arguments, though at times inconsistent, as sufficient to have preserved this issue for review.  In the trial court, Morris's counsel maintained that "if you are thinking about committing suicide because you are having suicidal ideations, then I think you're in a life-threatening situation."  He added, "I think that's enough under this statute because they use the term life threatening . . . .  I think that's the important part because the General Assembly is trying to get people that cause themselves to be in this kind of medical condition to go seek the help."  On brief here, Morris argued that he "believed he was suicidal because of his drug use."  He added that, "By expressing to the police that suicidal thoughts were creeping into his mind because of his drug use[,] . . . he was in a 'life-threatening' condition as defined by Virginia Code § 18.2-251.03."  The dissent quotes Morris's albeit inconsistent statement that "the query should be: under the totality of circumstances would a reasonably prudent person believe that he was suffering from a life-threatening situation."  The dissent omits the next sentence, that Morris "had every reason to believe that he was experiencing a 'life-threatening condition.'"  When oral argument made the nomenclature clear to both parties, Morris suggested that it involved both subjective and objective elements.  We need not belabor the point.  His inconsistency does not force us to declare that an objective standard applies.  "Our fidelity to the uniform application of law precludes us from accepting concessions of law made on appeal.  Because the law applies to all alike, it cannot be subordinated to the private opinions of litigants."  *Logan*, 47 Va. App. at 172.

The phrase "is experiencing" reflects the personal perspective of the accused—whether "*he* is *experiencing* an overdose." Code § 18.2-251.03(B)(1)(i)(a) (emphasis added). In its verb form, *to experience* means to "feel, suffer, undergo." *Experience*, *Webster's Third New International Dictionary* (2002). "Experience indicates an actual living through something" or knowing it "firsthand." *Id.* The perspective, in other words, is from the point of view of the person doing the "experiencing."

The dissent tries unsuccessfully to show that *is experiencing* connotes an "objective" standard. The dissent quotes *Webster's* definition of *experience* in its noun form: a "direct observation of or participation in events: an encountering, undergoing or living through things in general as they take place in the course of time." *Id.* Unlike the dissent, we see nothing in that definition to show that the defendant must actually be *having* an overdose to *experience* one. The dissent overlooks another of *Webster's* noun-form definitions that thoroughly undercuts the dissent's argument; *Webster's* also defines an *experience* as "something *personally encountered, undergone, or lived through*." *Id.* (emphasis added).

That inherently subjective viewpoint is reinforced by the requirement that the person "experiencing" an overdose seek medical attention "in good faith." The phrase "good faith" comports with its usual, subjective meaning, a "state of mind consisting in . . . honesty in belief or purpose." *Good Faith*, *Black's Law Dictionary* (11th ed. 2019); *see also Good Faith*, *Webster's*, *supra* ("[A] state of mind indicating honesty and lawfulness of purpose" or "belief in one's legal title or right"). As our Supreme Court said in the context of Virginia's Uniform Commercial Code, "Good faith does not encompass a concept of negligence; the test is a subjective one" and is "determined by looking to the mind" of the person in question. *Lawton v. Walker*, 231 Va. 247, 251 (1986); *see also* Code § 8.1A-201(b)(20) ("'Good faith' means honesty in fact in the conduct or transaction concerned."). The concept of "good faith" in the

medical-amnesty statute likewise calls for an assessment of the mind of the person seeking medical attention.

If the General Assembly had wanted an objective standard, it would have spoken in terms of whether a reasonable person would perceive the symptoms as an overdose; whether the victim was, in fact, having an overdose; or—better yet—whether the victim was "overdosing." By treating the phrase "is experiencing an overdose" as if it read "is overdosing," the dissent renders the term "experiencing" mere surplusage, "contrary to the settled rule in this Commonwealth that every provision in or part of a statute shall be given effect if possible." *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 163 (2021) (quoting *Travelers Prop. Cas. Co. of Am. v. Ely*, 276 Va. 339, 345 (2008)); *Blackwell v. Commonwealth*, 73 Va. App. 30, 50 (2021) (same).

The absence of such language in Virginia's medical-amnesty statute is conspicuous given that some States have expressly adopted an objective standard. Wisconsin's amnesty statute protects an "aider" who helps someone else seek emergency treatment for an overdose. Wis. Stat. § 961.443. But it provides protection only if "a reasonable person would believe" the victim to be suffering an overdose. *Id.*[5] Colorado's statute includes both a subjective and an objective standard. *See People v. Harrison*, 465 P.3d 16, 22-23 (Colo. 2020). Similar to Virginia's statute, Colorado's requires that the overdose victim (or good Samaritan) report "in good faith" the overdose event—a "subjective standard." *Id.* at 22 (citing Colo. Stat. 18-1-711(1)(a)). But unlike Virginia's statute, and like Wisconsin's, Colorado's statute

---

[5] Notably, the Wisconsin legislature adopted that objective standard in 2017, 2017 Wis. Sess. Laws 33, after Wisconsin's intermediate court observed in 2016 that the statute, as then drafted, protected "an individual who aids a person he/she believes is suffering from an adverse reaction to drugs." *Williams*, 888 N.W.2d at 5. The court characterized that belief as relating "*personally* to the defendant." *Id.* at 6 (emphasis added). *See generally* Emily O'Brien, *A Willful Choice: The Ineffective and Incompassionate Application of Wisconsin's Criminal Laws in Combating the Opioid Crisis*, 2020 Wis. L. Rev. 1065, 1079 (2020) ("An objective reasonable person standard replaced the aider's subjective belief that the aided person was overdosing or suffering an adverse reaction.").

specifically defines an "overdose event" as "an acute condition . . . *that a layperson would reasonably believe to be* a drug or alcohol overdose that requires medical assistance." *Id.* at 21 (quoting Colo. Stat. 18-1-711(5)). Colorado's Supreme Court read that phrase to "inject[] an objective standard into the analysis." *Id.* at 22.

Virginia's statute, by contrast, lacks that reasonable-person qualifier. It is "absent from Virginia's statute presumably because our legislature made a policy decision not to include it." *Broadous*, 67 Va. App. at 273. Virginia is not an outlier in using a subjective standard. Several other States employ a similar subjective standard as well.[6]

The dissent seizes on Florida's statute to show that "experiencing an overdose" requires an objective standard. Florida's statute refers to a "person who experiences, *or has a good faith belief that he or she is experiencing*, an alcohol-related or a drug-related overdose and is in need of medical assistance." Fla. Stat. Ann. § 893.21(2) (emphasis added). True, adding the italicized phrase to Virginia's statute would have reinforced that the standard is a subjective one. Had the General Assembly done that, we likely would not be having this debate. But that begs the question whether "experiencing an overdose" calls for a subjective or objective inquiry. And we find the dissent's argument unpersuasive that it is objective. Quite simply, "experiencing an overdose" does not mean "actually having an overdose."

Even assuming for argument's sake that "experiencing an overdose" is susceptible of either an objective or subjective construction, two longstanding interpretive principles would

---

[6] *E.g.*, Ark. Code Ann. § 20-13-1704(a)(2) ("The person is experiencing a drug overdose and in good faith seeks medical assistance for himself or herself."); Fla. Stat. Ann. § 893.21(2) ("A person who experiences, or has a good faith belief that he or she is experiencing, an alcohol-related or a drug-related overdose and is in need of medical assistance . . . ."); Ga. Code Ann. § 16-13-5(b) ("Any person who in good faith seeks medical assistance for a person experiencing or believed to be experiencing a drug overdose . . . ."); N.J. Stat. Ann. § 2C:35-30(a) ("A person who, in good faith, seeks medical assistance for someone experiencing a drug overdose . . . ."); Tenn. Code Ann. § 63-1-156(b) ("Any person who is experiencing a drug overdose and who in good faith seeks medical assistance . . . .").

require that we apply the subjective interpretation that favors defendants. First, the statute is highly remedial and entitled to a liberal construction. *Cf. Smallwood v. Commonwealth*, 300 Va. 426, 435 (2022) ("Statutes that permit the trial court to impose alternatives to incarceration . . . are highly remedial and should be liberally construed to provide trial courts valuable tools for rehabilitation of criminals." (alteration in original) (quoting *Peyton v. Commonwealth*, 268 Va. 503, 508 (2004))); *Slusser v. Commonwealth*, 74 Va. App. 761, 773 (2022) (same). As we said in *Broadous*, the purpose of medical amnesty is to "save a life," a value that we said was more important than obtaining a conviction for drug possession. 67 Va. App. at 271.

And second, the rule of lenity requires that we construe any ambiguity in a statute in the defendant's favor, "reducing exposure to criminal liability." *Fitzgerald v. Loudoun Cnty. Sheriff's Office*, 289 Va. 499, 508 (2015). *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 296 (2012) (Canon 49, Rule of Lenity: "Ambiguity in a statute defining a crime or imposing a penalty should be resolved in the defendant's favor."). The rule of lenity is "founded on the tenderness of the law for the rights of individuals, and on the plain principle that the power of punishment is vested in the legislative not in the judicial department." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Opinion by Marshall, C.J.), *quoted in Jennings v. Commonwealth*, 109 Va. 821, 823 (1909). Put simply, "when the government means to punish, its commands must be reasonably clear." Scalia & Garner, *supra*, at 299.[7]

---

[7] The Supreme Court of Virginia has repeatedly applied this principle to resolve statutory ambiguities in favor of criminal defendants. *E.g.*, *Blake v. Commonwealth*, 288 Va. 375, 386 (2014); *Thompson v. Commonwealth*, 277 Va. 280, 291-92 (2009); *Harris v. Commonwealth*, 274 Va. 409, 415-16 (2007); *Waldrop v. Commonwealth*, 255 Va. 210, 214-15 (1998); *Yarborough v. Commonwealth*, 247 Va. 215, 218-19 (1994); *Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168, 178-79 (1988); *Harward v. Commonwealth*, 229 Va. 363, 366-67 (1985); *Martin v. Commonwealth*, 224 Va. 298, 300-01 (1982); *Johnson v. Commonwealth*, 211 Va. 815, 819 (1971); *Berry v. City of Chesapeake*, 209 Va. 525, 526-27 (1969); *McKinney v. Commonwealth*, 207 Va. 239, 243 (1966); *Anderson v. Commonwealth*, 182 Va. 560, 565-66

To be sure, the rule of lenity does not apply when it "would conflict with the implied or expressed intent of [the legislature]," *Kohl's Dep't Stores, Inc. v. Va. Dep't of Taxation*, 295 Va. 177, 188 n.8 (2018) (quoting *Liparota v. United States*, 471 U.S. 419, 427 (1985)), nor when it would lead to "an unreasonably restrictive interpretation of the statute," *McGinnis v. Commonwealth*, 296 Va. 489, 504 (2018). But neither of those exceptions applies here.

To the contrary, applying an objective standard would frustrate the statute's "clear purpose . . . to encourage . . . prompt emergency medical treatment" for overdose victims. *Broadous*, 67 Va. App. at 271. The dissent effectively insists that defendants produce expert testimony to prove that they were, in fact, having an overdose. The dissent would require Morris to prove through "medical evidence" that "he actually was suicidal" and that his suicidal state "was caused by his use or consumption of drugs." *Infra* at 36. Such a begrudging standard could cause people to hesitate before seeking emergency care. It could make them ask questions like, "Am I really overdosing?" "Would a reasonable person be overdosing if they took what I did?" "Do I need a note from my doctor before calling 911?" The deterrent effect of an objective standard might be worse for the good Samaritan who, while using illegal drugs alongside an overdosing victim, would have to decide whether to risk prosecution by calling for help when the victim is "experiencing an overdose." *See* Code § 18.2-251.03(B)(1)(ii). The good Samaritan might waver, worrying that a mistake about whether the victim is, in fact, overdosing would trigger criminal liability for both of them.

This is not to say, of course, that persons using illegal drugs always behave as rational actors during an overdose crisis. But it is for the General Assembly, not courts, to make such

---

(1944). So have we. *E.g.*, *Foley v. Commonwealth*, 63 Va. App. 186, 197-99 (2014); *McMillan v. Commonwealth*, 55 Va. App. 392, 401-02 (2009) (en banc); *Lawson v. Commonwealth*, 38 Va. App. 93, 96-97 (2002); *Richardson v. Commonwealth*, 25 Va. App. 491, 496 (1997) (en banc).

- 14 -

behavioral assumptions.  And the premise of Virginia's medical-amnesty statute—as we said in *Broadous*—is that removing the threat of drug prosecutions will increase the provision of medical care for overdose sufferers, thereby saving lives.  67 Va. App. at 271.  The General Assembly made an obvious "policy determination" that saving a life is more important than prosecuting the drug-possession charge.  *Id.*  A subjective standard better advances that purpose than an objective one.[8]

We are not persuaded by the Commonwealth's claim at oral argument that a subjective standard would make it "very difficult" if not "impossible" to rebut a defendant's claim that he subjectively believed he was contemplating suicide or experiencing an overdose.  The Commonwealth failed to explain why that would be.  The statute forecloses the most obvious scenario in which a subjective standard might be susceptible to abuse.  Immunity is not available if the claim for emergency medical treatment is made "during the execution of a search warrant or during the conduct of a lawful search or a lawful arrest."  Code § 18.2-251.03(C).  So a defendant apprehended in a drug bust cannot immunize his illegal possession of drugs by claiming to be suicidal or insisting that he needs to go the emergency room.

What is more, there are countless instances when criminal liability turns on a party's subjective belief or good faith, yet courts have not abandoned the subjective requirement as somehow too hard to prove.  First-degree murder requires the prosecution to prove that the defendant committed a "willful, deliberate, and premeditated killing," while attempted murder requires proof of a "specific intent to kill the victim."  *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Commonwealth v. Herring*, 288 Va. 59, 77 (2014)).  Direct evidence of the defendant's intent is often not available but is also not required.  "[I]ntent may be, and most

---

[8] The dissent mistakenly attributes this policy judgment to judicial activism, without citing *Broadous* and without acknowledging that *Broadous* derived the "clear" and "obvious[]" purpose of the medical-amnesty statute from the text of the statute itself.

- 15 -

often is, proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." *Id.* (quoting *Viney v. Commonwealth*, 269 Va. 296, 301 (2005)); *see, e.g.*, *Bell v. Commonwealth*, 11 Va. App. 530, 533-34 (1991) (finding that circumstantial evidence supported intent-to-kill element of attempted capital murder). Similar specific-intent requirements are found in crimes involving intent to defraud, *e.g.*, *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021); crimes requiring proof of lascivious intent or sexual arousal, *e.g.*, *Holley v. Commonwealth*, 38 Va. App. 158, 165-66 (2002); and crimes involving an intent to threaten, *e.g.*, *Summerlin v. Commonwealth*, 37 Va. App. 288, 297-98 (2002). The Commonwealth has failed to show that a subjective standard under the medical-amnesty statute would impose an insurmountable obstacle to prosecutions in drug-possession cases compared to the myriad other settings in which a subjective standard applies.

> B. *Suicidal ideation qualifies as an "overdose" when it is "a life-threatening condition."*

At oral argument, the Commonwealth also maintained that an "overdose" under the medical-amnesty statute does not include a drug-induced desire to kill oneself. The Commonwealth argues that suicidal ideation is not within the "ordinary understanding" of the term "overdose."

We need not determine the ordinary meaning of "overdose," however, because the General Assembly specifically defined that term in the statute as "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances." Code § 18.2-251.03(A). That defined term supersedes its ordinary meaning. *Cf. Worsham v. Worsham*, 74 Va. App. 151, 168 (2022) ("[T]he ordinary meaning of such terms does not control when, as in this case, 'it is manifest from the [instrument] itself that *other definitions are intended*." (second alteration in original) (quoting *Riverside Healthcare Ass'n, Inc. v. Forbes*, 281 Va. 522, 530 (2011))).

- 16 -

Drug-induced suicidal ideation that prompts an emergency-room visit qualifies as a "life-threatening condition" under Code § 18.2-251.03(A). A "threat" is "[a]n indication of an approaching menace" or a "thing that might well cause harm." *Threat*, *Black's*, *supra*. If a person who is thinking about killing himself is concerned enough to seek emergency medical attention to avoid doing so, such suicidal thoughts pose a threat, menace, or risk of harm to that person's life.[9]

Because drug-induced suicidal ideation falls within the statutory definition, it does not matter if the General Assembly specifically contemplated a drug user's risk of suicide when enacting the medical-amnesty statute. Statutes "often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Encouraging a person with drug-induced suicidal ideation to seek emergency medical assistance falls within the "plain language" of the statute and serves its "clear purpose" of helping to "save a life." *Broadous*, 67 Va. App. at 271.

CONCLUSION

The circuit court erred in using an objective standard to test Morris's immunity under Code § 18.2-251.03. We vacate Morris's drug-possession conviction (Case No. CR21-1545-00F) and remand this case for the trial court to conduct a new hearing on Morris's motion to suppress and motion to dismiss that charge, consistent with this opinion.

*Vacated and remanded.*

---

[9] We do not hold that every instance in which a defendant claims to be experiencing suicidal ideation necessarily constitutes a life-threatening condition. *See* dissent, *infra* at note 24. Rather, the fact finder should determine based on the evidence whether the defendant who claims medical-amnesty immunity was seeking emergency medical attention in good faith because of a life-threatening drug- or alcohol-induced desire to kill himself.

- 17 -

Russell, J., dissenting.

Unlike the political branches who actively formulate policy and seek out the matters in which they are engaged, the judicial function, when properly performed, is a modest one. Courts are charged with answering only those questions necessary to resolve the cases brought to us by the litigants as opposed to questions we wish the litigants had raised. Courts are to decide cases on the record before them, with appellate courts limited to the argument and evidence raised in the proceedings below. Furthermore, in determining the meaning of statutes, we are governed by the actual words adopted by the political branches. Policy questions are the province of the political branches, and thus, we may not "add[] language to or delet[e] language from a statute" in the guise of interpreting that statute. *Appalachian Power Co. v. State Corp. Comm'n*, 284 Va. 695, 706 (2012) (citing *BBF, Inc. v. Alstom Power, Inc.*, 274 Va. 326, 331 (2007)). Thus, although it long has been recognized that "[i]t is emphatically the province and duty of the judicial department to say what the law is[,]" *Fitzgerald v. Loudoun Cnty. Sheriff's Off.*, 289 Va. 499, 505 (2015) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)), proper performance of that duty requires us not to stray outside our proper role.

Unfortunately, although no doubt well-intentioned, the majority violates the judicial norms listed above. As explained below, I believe the majority's departures from these norms lead the majority to an incorrect conclusion: that a defendant may invoke the protections of the overdose statute without actually experiencing an overdose. Accordingly, for the reasons that follow, I respectfully dissent.

## I. Proper view of the evidence

The manner in which an appellate court is required to view the evidence on appeal is well established. We are required to view the evidence adduced below "in the light most favorable to the Commonwealth, the prevailing party below." *Beck v. Commonwealth*, 66 Va. App. 259, 262

(2016) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)). Applying this principle requires us to grant the Commonwealth any reasonable inferences that may be drawn from such a view of the evidence. *Id.*

This view of the evidence governs even if most or all of the evidence is presented to the trial court by way of stipulation instead of by way of testimony. Accordingly, if a stipulated fact is susceptible to multiple interpretations, we are required to adopt the interpretation "most favorable to the Commonwealth, the prevailing party below." *Id.* Similarly, the Commonwealth is entitled to any reasonable inferences that flow from that interpretation. *Id.* Accordingly, in my dissent, I view the evidence through that lens.

The majority suggests that this fundamental rule of appellate review might not apply in this case. *See supra* note 1, at p. 4. In support of its novel proposition, the majority first cites *Massenburg v. City of Petersburg*, 298 Va. 212, 216-17 (2019), a civil case involving whether litigants are entitled to a jury trial on a plea in bar. It has no relevance here as no one contends that a jury was required to resolve the issue before the trial court.

Next, the majority cites to *Farmer's Ins. Exchange v. Enterprise Leasing Co.*, 281 Va. 612, 617 (2011), a civil case involving a motion for summary judgment in a dispute over a rental car contract, for the unremarkable proposition that, in summary judgment proceedings involving *undisputed* facts, an appellate court "review[s] *de novo* the circuit court's application of the law to the undisputed facts." Setting aside that summary judgment in Virginia is a unique animal that rarely has application outside of the summary judgment context, the case provides no instruction for when, as here, facts are in dispute.

The parties below stipulated that Morris *stated* on the night in question both that he was suicidal and that he believed his suicidal ideation was caused by his drug use. There was no stipulation that he was *in fact* suicidal or that, assuming he was suicidal, any suicidal ideation

actually was caused by his use or consumption of drugs.  To the contrary, the Commonwealth

has always *disputed* these assertions of fact, and the trial court specifically found that Morris

failed to establish that any suicidal thoughts were caused by his use or consumption of drugs.[10]

Because this conclusion is supported by the record, we are bound by it and the inferences that

flow from it.  The fact that we review legal questions *de novo* does not change that no matter

how much the majority wishes it were otherwise.

## II. The majority's reversal is improperly based on an argument that Morris did not make and has rejected.

Before turning to the errors in the majority's construction of the statute, I note that the

majority's resolution, that the statute adopts a purely subjective standard, would be improper in

*this* case even if it were correct.[11]  In adopting that construction, the majority must ignore or

misstate portions of the record in this case and *sua sponte* advances an argument that even

Morris rejected.  Thus, not only does the majority have to ignore the requirement of a

contemporaneous objection in the trial court and the requirement of assigning error to a judgment

of the trial court to reach its desired conclusion, it has to reject the arguments of the parties and

decide the matter on an argument that it alone crafted and champions.  As noted above, the

proper role of an appellate court is to decide the cases brought to it by the litigants based on the

arguments and record made by the litigants.  The crafting of appellate arguments is a function for

lawyers, not courts, and the majority's doing so here simply is improper.[12]

---

[10] To the extent that the stipulated evidence does not establish all of the facts necessary for Morris to prevail, the majority, having concluded that Morris bore the evidentiary burden, is duty-bound to affirm his conviction.  After all, it is axiomatic that, in the absence of necessary evidence, the party with the evidentiary burden loses.

[11] As explained in detail below, it is not correct.

[12] I recognize that we review questions of statutory interpretation *de novo*.  That standard does not give us license to craft our own arguments or address arguments neither raised nor

- 20 -

In the proceedings below, neither Morris nor the Commonwealth argued anything other than that Code § 18.2-251.03 employs an objective standard.[13] Given that agreement, it is unsurprising that, as the majority notes, "[t]he parties agreed at oral argument [in this Court] that the trial court used an objective standard in applying Code § 18.2-251.03."

Morris did not object to the trial court's application of an objective standard, precluding our reversing the trial court for that reason. Rule 5A:18 (providing that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling"); *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) ("Pursuant to Rule 5A:18, this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998))), *aff'd*, 270 Va. 1 (2005). Furthermore, likely because he agreed with the trial court, Morris did not assign error to the trial court's use of an objective standard, which also precludes us from reversing the trial court for doing so. *Delp v. Commonwealth*, 72 Va. App. 227, 236 n.7 (2020) (holding that "[w]e are 'limited to reviewing the assignments of error presented by the litigant'" (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 289 (2017))); *see also Winston v. Commonwealth*, 51 Va. App. 74, 82 n.4 (2007) (holding that because an appellant did not include

preserved by the litigants. Rather, it applies to the questions of statutory construction properly raised, preserved, and consistently maintained by the litigants.

[13] In addressing the failure of Morris to make any explicit argument that the statute adopted a purely subjective standard, the majority asserts that certain arguments by Morris in the trial court implicitly set out the argument. *See supra* note 4, at p. 9. Even absent context, it is a creative reading of Morris' position; with context, it conflates Morris' answer to the question with what the question is. In context, Morris' statement that "if you are thinking about committing suicide because you are having suicidal ideations, then I think you're in a life-threatening situation" is nothing more than his pointing to the evidence he believes established that an objectively reasonable person would believe he was in a life-threatening situation when he sought medical care. Any doubt that this was Morris' meaning is extinguished by a review of the argument he made in this Court that I discuss below.

- 21 -

an argument in his questions presented (now assignments of error), the Court would not address it on appeal).

Compounding the impropriety of the majority reversing the decision of a trial court on the basis of an objection never made and an alleged error never assigned is the fact that, in his brief on appeal, *Morris rejected* the construction of the statute championed by the majority. As he had from the outset of the case, Morris maintained on appeal that an *objective* standard governs Code § 18.2-251.03, writing on brief that:

> Morris submits that when determining whether a person is having a "life-threatening" condition that the query should be: *under the totality of circumstances would a reasonably prudent person believe that he was suffering from a life-threatening situation.*

(Emphasis added).

Generations of lawyers and even law students recognize that reference to the actions of the "reasonably prudent person" signals an objective test. Certainly, that has been the consistent position of Virginia's appellate courts. *See, e.g.*, *Allison v. Brown*, 293 Va. 617, 629 n.5 (2017) (defining "an objective standard" as what "a reasonably prudent person" would have done); *Va. Elec. & Power Co. v. Dungee*, 258 Va. 235, 252 (1999) (recognizing that "the objective test is normally stated simply in terms of the reasonably prudent person"); *A.H. v. Rockingham Pub. Co.*, 255 Va. 216, 223 (1998) (stating that "duties are premised upon the objective concept of what a reasonably prudent person in the exercise of reasonable care would have done in similar circumstances"); *Christian v. Commonwealth*, 33 Va. App. 704, 712 (2000) (noting that "the objective test for reasonable suspicion . . . 'is whether the reasonably prudent man in the circumstances would be warranted in the belief'" (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968))); *Wechsler v. Commonwealth*, 20 Va. App. 162, 169-70 (1995) (recognizing that the "objective standard" regarding whether a person is seized for purposes of the Fourth Amendment

turns on whether a reasonable person would have felt free to leave under the circumstances).  It is telling that the majority has failed to identify a single case in which the reasonably prudent person standard was read as creating a subjective test.[14]

Not only does the majority fail to cite a case for this proposition, but the majority itself also rejects the proposition when it is not attempting to create out of whole cloth an argument never advanced by Morris.  Specifically, in discussing the laws of other states, the majority recognizes the fundamental principle that "reasonable person" language signals an objective test, writing:  "If the General Assembly had wanted *an objective standard*, it would have spoken in terms of *whether a reasonable person* would perceive the symptoms as an overdose."  *Supra*, at p. 11 (emphasis added).

Although at this point there should be no doubt that the majority's subjective-standard position is an argument it and not Morris has raised, oral argument in this Court further demonstrates the point.  When asked questions at oral argument that suggested the majority wished to adopt a subjective standard, Morris steadfastly and resolutely continued to maintain what his argument always has been:  that the statute imposes an objective standard and that he met it.  In what charitably could be described as understatement and less charitably as misleading, the majority characterizes the exchange as "[w]hen oral argument made the nomenclature clear to both parties, Morris suggested that it involved both subjective and objective elements."  The actual words that Morris used are more telling and invalidate the position (and characterization) advanced by the majority.

_____

[14] Unable to address Morris' reasonable person language choice directly, the majority again offers snippets from his brief in which Morris references his subjective belief that he was suicidal as a result of consuming drugs.  Once again, this conflates the evidence Morris offers to answer what he recognized was an objective question with the question itself.

Specifically, when essentially asked by the majority to agree that the statute utilizes a subjective standard, Morris responded that his "argument is that his subjective view is one of the facts that the [trial] court should take into account in determining the objective view." Clearly, as he has maintained from the beginning, Morris' position is that his subjective beliefs are *evidence* that the trial court had to consider in answering the *objective* question of whether he was entitled to the protections of the statute. Simply put, the record makes clear that neither Morris nor anyone else other than the majority has ever taken a different position in this case. Thus, the machinations of the majority to recast the argument to one it wishes had been made are unavailing.

What is more, they are improper. To answer a question that we are not asked and that is not properly before the Court is to offer "an impermissible advisory opinion." *Va. Mfrs. Ass'n v. Northam*, 74 Va. App. 1, 21 (2021). The judiciary has a "duty 'not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Va. Dep't of State Police v. Elliott*, 48 Va. App. 551, 554 (2006) (quoting *Hankins v. Town of Virginia Beach*, 182 Va. 642, 644 (1944)).

The rationale for this long-held principle is readily apparent. Courts convene to decide cases and controversies that are brought before them by litigants; courts do not choose the issues they decide. Thus, even if there are questions of statutory construction that are interesting, we do not answer those questions unless and until they are necessary to resolve the dispute brought to us by the litigants.[15] I now turn to the proper interpretation of Code § 18.2-251.03 as framed by

---

[15] Faced with the fact that in both his brief and at oral argument in this Court, Morris not only failed to advance, but rejected, the majority's subjective standard construction of the statute, the majority, citing our decision in *Logan v. Commonwealth*, 47 Va. App. 168, 172 (2005) (*en banc*), characterized Morris' statements on brief and at argument as non-binding concessions of law by a party. In doing so, the majority improperly conflates a concession of law with a failure to preserve an argument or a waiver/abandonment of an argument that was at one time preserved. Moreover, there is no question that the majority knows that it is improperly conflating the two

- 24 -

the record in this case and the actual arguments of the parties, i.e., what Morris was required to show to avail himself of the statute's protection and whether the trial court erred in finding he failed to meet his burden.

## III.  Code § 18.2-251.03

As the majority notes, Code § 18.2-251.03 shields a person from prosecution for specified drug offenses if certain statutory requirements are satisfied.  As pertinent here, the statute provides that Morris was not "subject to arrest or prosecution for . . . possession of a controlled substance pursuant to § 18.2-250 . . . if . . . [he] in good faith, s[ought] or obtain[ed] emergency medical attention . . . for himself, if he *is experiencing an overdose*[.]" Code § 18.2-251.03(B)(1)(i) (emphasis added).  In short, to claim the protections of the overdose statute, a person must, in fact, be suffering an overdose.

Despite this clear language, the majority concludes that Morris could be entitled to the protections of the statute even if he was not "experiencing an overdose[,]" Code § 18.2-251.03(B)(1)(i), so long as he subjectively believed that he was or possibly might have been.  For the reasons that follow, this position cannot be reconciled with the text of the statute, and therefore, occasions my dissent.

---

because we drew the distinction on the very page of *Logan* cited by the majority and, in footnote 3 of its opinion in this case, *supra*, at p. 8, the majority cites the very passage from *Logan* that draws the distinction.  In *Logan*, we expressly recognized that

> This principle must be distinguished, however, from an appellant's concession of law that qualifies either as a waiver for purposes of Rule 5A:18 or as an express withdrawal of an appellate challenge to a trial court judgment.  In either scenario, we may accept the concession—not as a basis for deciding the contested issue of law, but as a basis for not deciding it.

47 Va. App. at 172 n.4.  The distinction is critical here because the initial issue this Court must determine is whether the question is properly before us, not whether the statement is correct should the matter be properly before us.  The fact that the majority chooses to conflate the issues despite being well aware of the distinction speaks volumes.

- 25 -

A.  Definition of "overdose"

Although "overdose" is a common term with a known meaning, the General Assembly provided a specific statutory definition of "overdose" in Code § 18.2-251.03.  Virginia courts long have recognized that, when the General Assembly provides a statutory definition, that definition controls over the common or ordinary understanding of the word or phrase.  *See, e.g.*, *Frias v. Commonwealth*, 34 Va. App. 193, 200 (2000) (citing *Life & Cas. Ins. Co. of Tennessee v. Unemployment Comp. Comm'n of Virginia*, 178 Va. 46, 57 (1941)).  Accordingly, the statutory definition of "overdose" governs our review.

For the purpose of Code § 18.2-251.03, the General Assembly defined "overdose" to mean "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances."  Code § 18.2-251.03(A).  Thus, for the protection afforded by Code § 18.2-251.03 to apply, it had to be established that Morris, when he sought medical attention, "[wa]s experiencing" "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances."  Code § 18.2-251.03.  Accordingly, I turn to the meaning of "is experiencing" as used in Code § 18.2-251.03.

B.  Definition of "is experiencing"

Unlike with "overdose," the General Assembly did not provide a statutory definition of "is experiencing" in Code § 18.2-251.03.  Consequently, we apply the plain and ordinary meaning of the words.  *See Hubbard v. Henrico Ltd. P'ship*, 255 Va. 335, 340 (1998) (holding that if "a statute contains no express definition of a term, the general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used" (citing *City of Va. Beach v. Flippen*, 251 Va. 358, 362 (1996); *Marsh v. City of Richmond*, 234 Va. 4, 11 (1987))); *see also Moyer v. Commonwealth*, 33 Va. App. 8, 35 (2000) (*en banc*)

(holding that "when a particular word in a statute is not defined therein, a court must give it its ordinary meaning" (citing *McKeon v. Commonwealth*, 211 Va. 24, 27 (1970))). In ascertaining the plain and ordinary meaning of such undefined words and phrases, it is appropriate for courts to turn to dictionary definitions. *Eberhardt v. Commonwealth*, 74 Va. App. 23, 32 (2021) (citing *Jones v. Commonwealth*, 296 Va. 412, 415 (2018); *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 335 (2021)).

The plain and ordinary meaning of the word "is" should be sufficiently familiar as to obviate the need for explanation; however, the majority's interpretation of the statute suggests otherwise. "Is," a form of the verb "to be," conveys a state of current reality, as opposed to past, future, potential, or conditional existence. In its various forms, its meanings include "that which is factual, empirical, [or] actually the case[.]" *Webster's Third New International Dictionary* 1197 (1981). Adopting the plain and ordinary meaning of "is" leads to the conclusion that the General Assembly intended that whatever fact or condition follows "is" actually existed at the time in question (as opposed to in the past or that may have come to be in the future) and was not merely possible, theoretical, or imagined.[16]

I now turn to the word following "is" in the statute, "experiencing," a form of the word "experience." As used in Code § 18.2-251.03, it conveys "a direct observation of or participation in events; an encountering, undergoing, or living through things in general as they take place in the course of time[.]" *Webster's*, *supra*, at 800. Applying this plain and ordinary meaning of "experiencing," leads to the conclusion that, to be entitled to the protections of Code § 18.2-251.03, Morris had to be undergoing or living through an "overdose," that is he had to be

---

[16] It is telling that the majority does not address the fact that the word "is" connotes "that which is factual, empirical, [or] actually the case" and not what may appear to be the case. Acknowledging this fact would make clear that the majority's construction of the statute is erroneous, so the majority apparently concludes it is just best to ignore it.

facing "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances."

Recognizing that this common understanding of what it means to experience something is fatal to its preferred result, the majority digs deeper into the dictionary, citing alternative definitions of "experience" to mean "something personally encountered, undergone, or lived through." The majority asserts that these alternative definitions "thoroughly undercut[]" the notion that the statute is objective. A moment's reflection reveals that not only is the majority's assertion overwrought, but it simply is also incorrect.

Adopting these alternative definitions of experience does not alter the outcome. Whether the statute reads "is experiencing an overdose[,]" "is personally encountering an overdose," "is undergoing an overdose[,]" or "is living through an overdose[,]" the condition that must be experienced, personally encountered, undergone, or lived through is "an overdose," not "an imagined overdose" or a "subjectively held belief that he was experiencing an overdose when he was not."[17]

Whether Morris or any defendant "*is experiencing*" "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances" at the time he seeks or obtains medical treatment is a question of *objective* fact.[18] Either the person is, at that moment, faced with a life-threatening situation caused by the

---

[17] Throughout its opinion, the majority asserts that the focus of this particular portion of the statute is on the individual seeking its protection. I wholeheartedly agree that the focus of Code § 18.2-251.03(B)(1)(i) is on the defendant as opposed to the world writ large. The question is whether a defendant establishes that he was "experiencing an overdose[,]" not whether someone else was. Thus, just like the majority, my focus is on the individual claiming protection under the statute.

[18] Because it presents a question of objective fact as opposed to belief, a court properly applying the statute is not asked to determine either what the defendant subjectively believed or what the hypothetical reasonable man would have believed. Rather, the question is whether there is, *in fact*, an overdose as defined in the statute.

- 28 -

consumption or use of controlled substances/alcohol or he is not. The words chosen by the General Assembly require that there actually be an overdose.[19] In short, to claim the protection of the overdose statute, a defendant actually must be "experiencing an overdose." Code § 18.2-251.03(B)(1)(i). To hold otherwise ignores the plain meaning of the pertinent words that appear in the statute.

IV. The majority's erroneous adoption of a subjective standard

Despite the plain and ordinary meaning of "is experiencing an overdose[,]" the majority maintains that the protections of the overdose statute do not require an actual overdose. The majority concludes that even if, as a matter of objective, medical fact, the evidence establishes that a defendant was *not* facing (and thus did not experience) "a life-threatening condition resulting from the consumption or use of a controlled substance, alcohol, or any combination of such substances" at the time he sought or obtained medical treatment, he can claim the protections of the statute so long as he believes that he may have been or was. In adopting the subjective standard, the majority effectively reads out of the statute the express requirement that a defendant be "experiencing an overdose[,]" Code § 18.2-251.03(B)(1)(i), and effectively replaces it with "*believes or imagines* that he is or *may be* experiencing an overdose."

This effective rewriting of the statute is outside the proper role of the judiciary because it amounts to legislating from the bench. The Supreme Court recently reiterated that such judicial editing of statutes is impermissible, noting that "[c]ourts are not permitted to rewrite statutes.

---

[19] An example of the plain and ordinary meaning of "experiencing" in another medical context makes this clear beyond all doubt. Assume a person is having severe chest pains and goes to the emergency room because he subjectively believes he is having a heart attack. The work-up that follows demonstrates no heart attack or cardiac condition whatsoever, but rather, conclusively establishes that the chest pain was caused by indigestion. I do not believe anyone, including the majority, would say that the person "was experiencing a heart attack" when he sought treatment. To the extent that the majority, or anyone else, would use that formulation, they would not be attempting to clearly communicate information based on the plain and ordinary meaning of "experiencing," but would do so in pursuit of some other agenda.

This is a legislative function.  The manifest intention of the legislature, clearly disclosed by its language, must be applied." *Chesapeake Hosp. Auth. v. State Health Comm'r*, ___ Va. ___, ___ (May 19, 2022) (quoting *Anderson v. Commonwealth*, 182 Va. 560, 566 (1944)).

The majority claims it is doing no such thing and offers a multitude of reasons why its preferred construction, that the statute is satisfied by an imagined overdose, is consistent with the statutory language or, at the very least, the statute's purpose as perceived by the majority. Although I address specific infirmities in some of these reasons below, it is important to recognize that the majority's construction fails for the simplest of reasons:  the plain and ordinary meaning of the phrase "is experiencing an overdose" requires that a defendant *actually experience an overdose*.  Because any effort to hold that the overdose statute does not require an overdose negates the plain meaning of the phrase, it is in error no matter how well written or presented.[20]

### A.  The "good faith" red herring

Although unnecessary to properly interpret the phrase "is experiencing an overdose[,]" the majority offers its definition of "good faith" as it is used in Code § 18.2-251.03.  Citing both a dictionary and a Supreme Court decision interpreting the U.C.C., the majority concludes that "good faith" conveys a "subjective meaning" and thus, "calls for an assessment of the mind of the person" whose good faith is in question.  *Supra*, at pp. 10-11.  Although this may be a reasonable definition of "good faith," it is largely beside the point because, given its placement

---

[20] The majority refers to the statute as the "medical-amnesty statute" while I, on occasion, refer to it as the "overdose statute."  I do so because the text of the statute requires that there be an overdose.  Presumably, the majority avoids such a characterization of the statute because "medical-amnesty" sounds nicer and the majority's construction of the statute removes the requirement of an overdose from the statute.

in Code § 18.2-251.03, the phrase "good faith" does not modify "is experiencing an overdose[,]" which is the issue in this case.[21]

As noted above, Code § 18.2-251.03 provides that an individual is "not subject to prosecution" for certain drug offenses if he can meet certain statutory requirements. Among those requirements is that "[s]uch individual (i) in good faith, seeks or obtains emergency medical attention (a) for himself, if he is experiencing an overdose[.]" Applying ordinary rules of English usage and grammar, it is clear that "good faith" modifies "seeks or obtains emergency medical attention" but not "is experiencing an overdose." After all, "good faith" appears next to "emergency medical attention," but is separated from "is experiencing" by many words, multiple punctuation marks, and, importantly, the conditional introductory word "if," rendering "he is experiencing an overdose" a separate and distinct clause from that which preceded it.

Thus, this portion of the statute sets out two, *distinct* requirements. First, the individual must seek or obtain medical care in "good faith," that is the motivation to seek medical care was to receive medical care as opposed to some other reason, such as avoiding prosecution. Second, he must be "experiencing an overdose," which, as noted above, is a question of objective fact that does not turn on an individual's belief. If the General Assembly had intended to engraft a subjective, good faith component onto the overdose requirement, it easily could have done so, *e.g.*, "[s]uch individual (i) in good faith, seeks or obtains emergency medical attention (a) for himself, if *he in good faith believes* he is experiencing an overdose." Courts must respect the

---

[21] Because "good faith" does not modify "is experiencing an overdose" in Code § 18.2-251.03, the majority's discussion of the meaning of "good faith" represents another instance of the majority addressing an issue not before us in this appeal. The trial court did not find that Morris failed to establish that he sought emergency medical treatment in good faith; rather, it found he failed to establish that he was "experiencing an overdose" as required by the statute. In both the trial court and on appeal, the Commonwealth has not argued an absence of "good faith," but rather, consistently has argued that Morris was not "experiencing an overdose."

choice of the General Assembly not to do so, and therefore, the majority errs by failing to respect that choice.

### B. The majority's selective misuse of the law of other states

The majority affords significant attention to reviewing the enactment of similar statutes in other states and claiming that those statutes and the courts that have interpreted them demonstrate that the General Assembly adopted a subjective standard when it enacted the "is experiencing an overdose" language in 2015. For the reasons that follow, the laws of other states compel no such conclusion and, in fact, an evenhanded application of the reasoning employed by the majority would support equally the conclusion that the laws of other states demonstrate that Virginia rejected a subjective standard.

At the outset, it is important to remember that when interpreting a Virginia statute, we seek to discern the *Virginia* General Assembly's meaning in enacting a statute, *Williams v. Commonwealth*, 265 Va. 268, 271 (2003), not the meaning or intention of another legislative body when it enacted a different statute. Thus, although reviewing such out-of-state authority may be helpful in limited instances, the interpretation of statutes (or court decisions interpreting those statutes) on the same topic from other states is at most persuasive and never controlling. Furthermore, the persuasive effect of out-of-state authority is diminished when the out-of-state statutes contain different words, as we are charged with determining the General Assembly's meaning from the words it adopted not from the word choices made by other legislatures.

Because there often will be potentially dispositive differences in the language in the statutes of various states, the possibility arises that a court relying on out-of-state authority will find persuasive those examples that suggest a preferred result rather than other examples which do not. Unfortunately, the majority opinion demonstrates such inconsistent selection of out-of-state authority.

The majority, citing Wisconsin and Colorado as examples, asserts that states employing an objective standard have included language limiting the protections of the statute if "a reasonable person would believe" or situations in which "*a layperson would reasonably believe to be* a drug or alcohol overdose[.]" *Supra*, at pp. 11-12 (citations omitted). From this, the majority reasons that the absence of such "reasonable person" language in Code § 18.2-251.03 means that the General Assembly rejects the objective approach adopted by Wisconsin and Colorado, and therefore, employs a subjective approach like other states identified by the majority. *Id.* at 10.

The majority identifies several states, including Florida, as states that have adopted the subjective standard. *Id.* at 12, note 6. A review of the language of the Florida statute eviscerates the majority's argument regarding the absence of "reasonable person" language in the Virginia statute. Florida employs the subjective standard not because its statute does not include "reasonable person" language, but because its legislature included express language adopting a subjective standard: the Florida statute insulates from prosecution a defendant "who experiences, *or has a good faith belief that he or she is experiencing*, an alcohol-related or a drug-related overdose and is in need of medical assistance[.]" Fla. Stat. Ann. § 893.21(2) (emphasis added). Thus, had the majority compared Virginia's statute to Florida's (as opposed to Wisconsin's and Colorado's) and applied its absence-of-language test, it necessarily would conclude that Virginia rejects a subjective standard because Virginia did not include the language "has a good faith belief that he or she is experiencing" an overdose that Florida, an acknowledged subjective-standard state, includes in its statute.

I point this out not to say that the majority should have compared the Virginia statute to the language of the Florida statute as opposed to the statutes in Wisconsin and Colorado, but rather, to demonstrate the limited utility of such comparisons to out-of-state authority. It should

- 33 -

go without saying that Code § 18.2-251.03 does not mean one thing if a panel of this Court compares it to a statute from Florida and the opposite if we instead opt to compare it to a statute from Colorado.[22]  That the majority's approach logically leads to that result indicates a problem in the approach, not simply its application.  Code § 18.2-251.03 has meaning independent of the actions of legislatures in Florida, Colorado, and every other state, and we are tasked with determining that independent meaning.

### C.  Canons of construction

The majority attempts to buttress its position by referencing various canons of statutory construction.  Specifically, it asserts that remedial statutes are to be liberally construed and that criminal statutes are subject to the rule of lenity.  The majority's resort to these rules of construction is inappropriate in this case.

As I have noted from the outset, our task is to determine "the plain meaning of unambiguous statutory language[.]"  *Gunn v. Commonwealth*, 272 Va. 580, 587 (2006).  Resort to other canons of construction, such as the rule of lenity, is inappropriate in the absence of actual ambiguity.  *See*, *e.g.*, *Holsapple v. Commonwealth*, 266 Va. 593, 598 (2003) ("We do not agree that the statutory language is ambiguous.  Hence, we construe the language according to its plain meaning without resort to rules of statutory interpretation."); *De'Armond v. Commonwealth*, 51 Va. App. 26, 34 (2007) ("Only when a 'penal statute is *unclear*' do courts apply the rule of lenity and strictly construe the statute in the criminal defendant's favor." (quoting *Waldrop v. Commonwealth*, 255 Va. 210, 214 (1998))).

---

[22] To the extent that such comparisons are useful, the statutes of Florida, Wisconsin, and Colorado all include language about a belief, whether objective or subjective, that a person is experiencing an overdose.  The Virginia statute does not reference belief, leading to the conclusion that it requires an *actual* overdose as a matter of objective fact.  *See supra*, note 18.

There simply is no legitimate ambiguity in the meaning of the phrase "is experiencing an overdose." Certainly, the language unambiguously requires "an overdose." To hold otherwise simply cannot be reconciled with the plain and ordinary meaning of the words chosen by the General Assembly.

## D. Judicial "editing"

The majority asserts that my construction of the statute effectively seeks to edit its language. Specifically, the majority asserts without support that "[b]y treating the phrase 'is experiencing an overdose' as if it read 'is overdosing,' the dissent renders the term 'experiencing' mere surplusage," *supra*, at p. 11. This simply is not accurate.

As noted above, my interpretation of the statute considers and gives meaning to *all* of the words "is experiencing an overdose" with the same result obtaining even if experiencing is held to fall within the dictionary definitions the majority suggests would be appropriate, "is personally encountering an overdose[,]" "is undergoing an overdose[,]" or "is living through an overdose[.]" Tellingly, to falsely accuse me of effectively excising "experiencing" from the statute, the majority does not simply remove "experiencing" from the statutory text, but rather, engages in additional judicial editing of the text, removing the article "an" and replacing "overdose" with "overdosing." No such editing is required by my construction, further demonstrating that the majority's charge is without merit.[23]

## V. Proper application by the trial court

Under both the majority's construction and how the parties presented the issue to the trial court, it was Morris' burden to convince the trial court that his claimed suicidal thoughts represented "a life-threatening condition resulting from the consumption or use of a controlled

---

[23] That the majority charges me with such judicial editing is, at the very least, ironic given that it is the majority whose construction of the statute edits the statutory text to add the words "or subjectively believes he is experiencing an overdose even if he is not" to the statute.

substance, alcohol, or any combination of such substances." Code § 18.2-251.03(A). With a proper understanding of what the statute requires, the trial court reasonably concluded that the evidence did not establish that Morris was "experiencing an overdose" when he sought medical care.

One of the bases for the trial court reaching this conclusion was that Morris failed to convince the trial court that his suicidal thoughts, such as they were, actually were caused by his "consumption or use" of a controlled substance. Although the stipulated evidence established that Morris claimed to be suicidal when he sought medical treatment and that he claimed that he believed it was due to "drug use," the stipulated evidence left open the question of whether he actually was suicidal and whether any such suicidal state was caused by his use or consumption of drugs.

Certainly nothing in the evidence compels the conclusion that Morris' asserted suicidal thoughts were caused by his use of cocaine that evening. No medical evidence was offered to establish such a causal link. In fact, no evidence was offered to suggest that the drug use Morris admitted to engaging in causes suicide or even is associated with it. The only evidence offered on the question of causation was Morris' statement that he believed that was the cause. Because a reasonable factfinder reviewing the evidence could remain unconvinced on causation, the trial court did not err in concluding that Morris had failed to establish he was suffering from an

overdose on the night in question.[24]  Accordingly, we should affirm the judgment of the trial

court, and the majority's conclusion otherwise elicits my respectful dissent.

---

[24] Although the trial court's causation finding was sufficient to dispose of the case, it also questioned whether Morris' claims of suicidal thoughts represented a "life-threatening condition[.]"  Code § 18.2-251.03(A).  Although I agree with the majority that there may be circumstances where suicidal thoughts may represent a sufficient threat to life to qualify as an "overdose" for the purpose of Code § 18.2-251.03(A), I disagree that such thoughts alone meet that standard.  For example, there may be situations in which a reasonable factfinder could conclude that mere suicidal thoughts without a plan or available means of effectuating those thoughts do not constitute a "life-threatening condition."  In short, whether suicidal thoughts are sufficiently life-threatening represents a question of fact for the factfinder and is not a question of law for us to resolve without reference to the facts and circumstances of specific cases.